UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAMEFAM, INC.,<br><br>    Plaintiffs,<br><br>        v.<br><br>WOWWEE GROUP LIMITED, et al.,<br><br>    Defendants. | Case No. 23-mc-80310-SI<br><br>**ORDER GRANTING IN PART GAMEFAM'S REQUEST FOR REIMBURSEMENT OF SIGNIFICANT EXPENSES INCURRED IN RESPONDING TO SUBPOENA**<br><br>Re: Dkt. No. 1 |

Before the Court is a motion by Gamefam, Inc. for reimbursement of significant expenses incurred in responding to a subpoena by WowWee Group Limited, et al. ("WowWee"). Dkt. No. 1. The subpoena was issued to require Gamefam to testify at a deposition in the civil action 22-cv-4476-SI, *Roblox v. WowWee Group Limited, et al.* ("the Lawsuit") and included document production requests. WowWee opposes the motion for reimbursement. Dkt. No. 17. For the reasons set forth below, the Court GRANTS IN PART Gamefam's request for reimbursement.

## BACKGROUND

### I.    The Subpoena Served on Gamefam and Communications Between Counsel

On July 14, 2023, WowWee served a Subpoena to Testify at a Deposition in a Civil Action ("the Subpoena) on Gamefam. Dkt. No. 2 ("Hooper Decl."), Ex. A. The Subpoena included requests for document production. At the time, the fact discovery cut-off date in the Lawsuit was September 13, 2023. The Lawsuit was filed on August 2, 2022. In its opposition to the present Motion, WowWee explains that it first served discovery on Roblox seeking its relevant communications with Gamefam before issuing the Subpoena to Gamefam, but at the time WowWee issued the Subpoena, Roblox had objected to many of its requests and had "failed to produce a single document that substantively discussed" any relevant meetings or communications with Gamefam or any internal communications shedding light on interactions with Gamefam during the summer of

2022. Dkt. No. 17 at 6-7. Thus, "WowWee had no choice but to subpoena Gamefam to obtain the critical documents and testimony" concerning Gamefam's communications with Roblox in the summer of 2022 and the relationship between Gamefam and Roblox. *Id.* at 7.

On July 21, 2023, Gamefam's counsel sent an email to WowWee's counsel "forecast[ing]" objections to the deposition topics and document requests contained within the Subpoena, including the associated costs of responding and objections to producing materials within the possession and control of Roblox or WowWee. Hooper Decl., Ex. B at 44-47. Between July 21, 2023 and October 3, 2023, Gamefam and WowWee's counsel engaged in numerous email and phone conversations regarding the Subpoena. *See id.*, Ex. B. The parties extensively discussed Gamefam's objections to the Subpoena, ways to reduce the volume of potentially discoverable documents, and negotiated a reduced scope to the Subpoena's requests. Gamefam's counsel provided cost updates to WowWee's counsel regularly and repeatedly, and consistently demanded that WowWee reimburse Gamefam for costs associated in responding to the Subpoena. WowWee asserted that it was under no obligation to cover Gamefam's fees or costs associated with responding to the Subpoena but would continue to work to reduce Gamefam's burden. *See id.* at 35, 28-29, 3-4. It also appears that WowWee spoke with WowWee's insurer about covering some of the costs. *See id.* at 17-20, 15, 9, 7, 1-5.

On August 22, 2023, Gamefam submitted "formal objections" by letter to WowWee's counsel. Hooper Decl., Ex. C.[1] The letter again noted that "Gamefam is entitled to compensation for its fees and costs and will require compensation." *Id.* On August 29, 2023, Gamefam provided preliminary document production totaling 43 documents and 111 pages. Hooper Decl., Ex. B at 22. On an August 29, 2023 video conference between Gamefam and WowWee and their attorneys,

---

[1] In the cover page to the formal objections letter, Gamefam's counsel indicates that WowWee's counsel requested the formal objections no later than August 25, 2023. Hooper Decl., Ex. C at ECF 1. On August 22, 2023, WowWee's counsel confirmed receipt of the letter but noted that "WowWee did not request 'Gamefam's formal objections' by August 25 or extend the deadline for objecting—August 25 was the date that I recently requested that Gamefam's documents be produced." Hooper Decl., Ex. B at 27. Previously, on August 16, 2023 Gamefam's counsel indicated via email that they had "not yet submitted objections to WowWee's subpoena because you have repeatedly assured us that WowWee would work with us in good faith to narrow the scope of the requested document production to avoid undue burden upon Gamefam . . . If those [good-faith narrowing] efforts fail, Gamefam will promptly submit official objections . . ." *Id.* at 34.

WowWee's Chief Executive Officer allegedly "made it clear to [Mr. Briceno, Gamefam's Chief Business Officer] and all of the call attendees that he agreed Gamefam should not suffer any losses as a result of the Subpoena." Dkt. No. 4 ("Briceno Decl.") ¶ 18. WowWee disputes that this conversation occurred. Dkt. No. 17 at 13 n.6. After receiving the August 29, 2023 production of documents, WowWee's counsel requested additional production and a privilege log, and the parties continued to confer about these requests for more than a month. *See id.* at 20-21. Ultimately, Gamefam produced 79 documents. Dkt. No. 17-1, Leiden Decl. ¶ 3. Gamefam's Chief Business Officer Ricardo Briceno appeared for the deposition on October 11, 2023. Hooper Decl. ¶ 11.

Gamefam "has no in-house legal team" so "had to retain the services of outside legal counsel Immix Law Group PC to manage the response, objections, data retrieval, document review and production, and deposition required by the Subpoena." Briceno Decl. ¶ 21. Immix offered Gamefam "below-market rates to reflect the sensitive budget needs for this small gaming company." Dkt. No. 3 ("Christian Decl.") ¶ 14. Gamefam "lacked the internal software services to manage the massive data collection required to respond" so retained the services of CyberDuo "to locate, collect, preserve, and upload Gamefam's documents." Briceno Decl. ¶ 22. Gamefam also retained the services of Streamline Imaging to serve as its document management vendor in responding to the Subpoena. Hooper Decl. ¶ 8, Briceno Decl. ¶ 23. Streamline Imaging "worked with Gamefam to process and cull the approximately 132,000 potentially responsive documents that had been collected," reducing the volume to approximately 90,000 documents. Hooper Decl. ¶ 9. Gamefam further indicates that it was "required to pay for the transcript of the Gamefam Subpoena deposition" and that its review of the transcript "included identification of highly confidential content requiring confidentiality designations and an errata sheet." Briceno Decl. ¶ 24.

Gamefam's counsel Dayna J. Christian indicates that she "reviewed each of my law firm's entries for time spent on this matter from the date of service of the Subpoena" to November 15, 2023. Christian Decl. ¶ 15. She reports that the total time incurred by Gamefam's counsel to respond to the Subpoena is 375.4 hours and the associated legal fees are $202,515. *Id.* She further indicates that she "excluded all time entries that I found to be unrecoverable, in any way unreasonable, or irrelevant to the substance of the Motion." *Id.* Additionally, "time logged

3

preceding the Subpoena's service was excluded even though pre-service negotiations and preparations were underway." *Id.* Christian provides a chart totaling the number of hours and associated fees by category, and explains what work each category encompasses. *Id.* ¶¶ 15-23. According to Mr. Briceno, the Subpoena response costs "have had a great impact on Gamefam's ability to manage and maintain its total operating budget" and Gamefam "has been forced to divert funds that are needed to support its staff's wages." Briceno Decl. ¶¶ 16-17. The "significant impact of these costs as a priority has left Gamefam in a position where it cannot support the monthly salaries of at least nine of its employees." *Id.* ¶ 17.

## II.    Gamefam's Connection to the Lawsuit

Roblox initiated the Lawsuit against WowWee on August 2, 2022. Gamefam was never a party to the Lawsuit but is discussed extensively in Roblox's amended complaint and WowWee's affirmative defenses and counterclaims. Additionally, WowWee listed Gamefam's CEO in its initial disclosures as someone likely to have discoverable information. *See* Leiden Decl., Ex. A. In its disclosures, Roblox listed four employees with subjects: "Roblox developers, including Gamefam." Leiden Decl., Ex. B.

### A.    WowWee's Allegations Pertaining to Gamefam in the Lawsuit

WowWee asserts several affirmative defenses in the Lawsuit, including acquiescence, license, waiver, and unclean hands, as well as counterclaims against Roblox alleging wrongful interference with WowWee's contractual relationship with Gamefam. *See* Roblox Dkt. No. 74.[2] WowWee and Gamefam "have a history of collaborating on projects where toys and promotion intersect through gaming." Roblox Dkt. No. 74 at 30, ¶ 22.[3] In 2021, WowWee partnered with

---

[2] WowWee USA's counterclaim for intentional interference with contractual relations was compelled to arbitration. Roblox Dkt. No. 96. The remaining counterclaims were stayed pending the outcome of the arbitration. *Id.*

[3] Filings in the docket 22-cv-4476-SI, *Roblox v. WowWee Group Limited, et al.* will be referred to as "Roblox Dkt. No. X." All other docket citations refer to the docket for the present motion.

Gamefam, "a top independent Roblox experience developer," to promote WowWee's My Squishy Little line of toys by placing characters based on them in Gamefam's Twilight Daycare game hosted on the Roblox platform. *Id.* at 26, ¶ 2. Gamefam also partnered with WowWee to create physical toys based on other characters in the Twilight Daycare game, the Twilight Daycare Collectible Babies. *Id.* at 26, ¶ 3. Each doll was sold with a redeemable code that allowed Roblox users to access special features in the game. *Id.* at 31, ¶ 25. Roblox did not object to this collaboration, and Roblox "continues to allow Gamefam to make experiences on Roblox that, at least according to Roblox's arguments in this litigation, arguably feature modified classic avatars in violation of Roblox's putative restrictions in its current Terms of Use." *Id.* at 24, ¶ 13; 26 ¶ 3.

In 2021, WowWee and Gamefam contracted to create the My Avastars Fashion Dolls and develop a corresponding online experience hosted on the Roblox platform, the My Avastars:RP game. *Id.* at 26, ¶ 4; 31, ¶ 27. Under this contract, WowWee, "an international family-run toy company," would design and create a customizable fashion doll and Gamefam would develop the My Avastars:RP game, in which users could customize an in-game avatar character to resemble their My Avastars doll. *Id.* at 30, ¶ 19; 31-32, ¶ 28. "Gamefam also developed and planned to feature rewards within the My Avastars:RP experience that consumers could access using codes found on the My Avastars Fashion Dolls boxes." *Id.* at 33, ¶ 33. WowWee publicly announced the creation of its My Avastars Fashion Dolls on June 18, 2022. *Id.* at 35, ¶ 41.

On or around June 22, 2022, Roblox "abruptly and materially changed its Terms of Use" to "expand Roblox's claimed intellectual property." *Id.* at 36, ¶ 46. Roblox then pressured Gamefam "to abandon its lawful contractual obligations and rescind its contribution to the My Avastars collaboration, knowing that Gamefam, which relies on the Roblox platform for its entire business, would not risk its own good standing with Roblox." *Id.* at 28, ¶ 9.

Gamefam initially "reassured WowWee . . . that it did not consider the collaboration was prohibited in any way by Roblox's Terms of Use" and made clear that it intended to continue working on the My Avastars:RP experience. *Id.* at 37, ¶ 50. These discussions are detailed in sealed discovery documents. *See* Leiden Decl., Ex. C. This allegedly changed after a meeting between Gamefam and Roblox on or around July 11, 2022. *Id.* at 37, ¶ 51. On July 19, 2022, "Gamefam

5

informed WowWee that it could no longer work on the My Avastars:RP game." *Id.* "On information and belief, Roblox pressured Gamefam to terminate its collaboration with WowWee through threats well beyond any specific legal concerns . . . and instead through separate threats Roblox made regarding the continued relationship with Gamefam, which Gamefam depended on for its business and other collaborations." *Id.* at 37-38, ¶ 51. Gamefam then terminated its contract with WowWee. *Id.* at 38, ¶ 52.

WowWee asserts in its opposition to this motion that WowWee confirmed through Gamefam documents and testimony that Gamefam pulled out of the deal "as a direct result of Roblox's pressure exerted on Gamefam and the fact that Gamefam relied on Roblox for its entire existence." Dkt. No. 17 at 8. WowWee provides details to support this assertion contained in sealed discovery documents. *See id.*

### B. Roblox's Allegations Pertaining to Gamefam in the Lawsuit

According to Roblox, WowWee "induced" Gamefam to partner with it so the "infringing My Avastars dolls could be paired" with a Roblox experience and "induced Gamefam to join it in marketing and selling the My Avastars dolls using both the Roblox name and content from Gamefam's My Avastars:RP experience in order to suggest that the dolls are connected to and endorsed by Roblox." Roblox Dkt. No. 36 ¶¶ 12-13. This, along with the promise of a "code" that could be used within the Roblox platform in the My Avastars:RP game, "is expressly prohibited by the Roblox Terms of Use." *Id.* ¶ 13. According to online posts by Gamefam, it is allegedly the "lead publisher for 40+ unique #Roblox games & brands" and it lists 20 Roblox experiences on its website. *Id.* ¶ 69. Gamefam "raised $25 million in its series A funding round in March 2022 to continue building games on Roblox." *Id.* ¶ 70 (citing Dean Takahashi, Gamefam raises $25 million to build games for Roblox, VENTUREBEAT (March 23, 2022), https://venturebeat.com/2022/03/23/gamefam-raises-25m-to-build-games-for-roblox/). Gamefam's CEO has said that Gamefam "plan[s] to build a huge brand and media business hand-in-hand with the Roblox platform" and "the truth is, right now we couldn't be more all about Roblox." *Id.* ¶ 71 (quoting Anthony Ha, Gamefam aims to be the first big gaming company built on Roblox,

TECHCRUNCH (Mar. 11, 2021, 7:12 AM), https://techcrunch.com/2021/03/11/gamefam). "On information and belief," in exchange for creating the My Avastars:RP experience Gamefam was to receive benefits from WowWee in connection with the promotion and sale of the My Avastars dolls. *Id.* ¶ 129.

On July 8, 2022 Roblox "informed WowWee that WowWee's activities constitute infringement of Roblox's intellectual property rights and tortious interference with Roblox's contractual relationship with Gamefam" reflected in Roblox's Terms of Use. *Id.* ¶ 78. Roblox's complaint details the ways in which WowWee's partnership with Gamefam "induced Gamefam" to breach the Roblox Terms of Use. *See id.* ¶¶ 129-131.

### C. What Gamefam Says About Itself

According to Gamefam, it is a "video game developer and publisher in the nascent metaverse" founded four years ago and based in Los Angeles. Briceno Decl. ¶ 6. Gamefam works with approximately 200 staff members worldwide, about half of whom are "employee developers" and half of whom are contractors. *Id.* ¶ 7. Gamefam began using the Roblox platform in 2019 and became an "active and prolific" user. *Id.* ¶ 8. "As an important part of its business, Gamefam also maintains confidential relationships" with a variety of companies. *Id.* ¶ 9. Gamefam had approximately $34 million in revenues (not profits) in 2022, making it a "small company" in the game developer market worldwide. *Id.* ¶ 19.[4]

### DISCUSSION

Federal Rule of Civil Procedure 45 allows the Court to award sanctions under Rule 45(d)(1), or to impose cost-shifting under Rule 45(d)(2)(B)(ii), to protect a person subject to a subpoena from undue burden or expense. The Court examines each subsection of the Rule in turn.

---

[4] Gamefam provides as comparisons the revenues (according to online resources) of "companies that share the market with Gamefam": Roblox ($2.2 billion in 2022), GSN Games ($272.7 million in 2022), NetEase ($14.27 billion in 2022), Tencent Holding ($82.406 billion in 2022), and Take-Two Interactive Software ($3.505 billion in 2022). Dkt. No. 1 at 6.

7

## I. Discretionary Sanctions Under Rule 45(d)(1)

Rule 45(d)(1) applies to parties and non-parties alike. *Legal Voice v. Storman Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013). Specifically, section (d)(1) provides:

> A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

This section is discretionary, although the Ninth Circuit has issued some guidance: failure to narrowly tailor a subpoena may be a ground for sanctions, although overbreadth "may sometimes result from normal advocacy, which . . . should not give rise to sanctions" and a court may impose sanctions "when a party issues a subpoena in bad faith, for an improper purpose, or in a manner inconsistent with existing law." *Id.* at 1185.

WowWee argues that Gamefam cannot seek the protections of Rule 45(d) because WowWee never agreed to reimburse and "made every effort" to reduce burden and costs. Dkt. No. 17 at 9, 12. WowWee and Gamefam negotiated for over two months about the scope of the Subpoena. *See* Hooper Decl., Ex. B. As a result of these back-and-forth communications, WowWee narrowed the scope of its document requests and suggested ways to reduce the number of documents Gamefam would need to review. *See id.* Ultimately, WowWee's requests were narrowed to the following: Gamefam's internal documents and communications with Roblox and other third parties regarding WowWee, My Avastars Fashion Dolls, the My Avastars:RP experience, Roblox's Terms of Use, and the Lawsuit, for June 15, 2022 through August 31, 2022 across six agreed-upon custodians; written notes from Gamefam's meeting with Roblox in July 2022; contracts and agreements between Gamefam and Roblox; documents sufficient to show Gamefam's revenues and profits relating to the promotion of WowWee's My Squishy Little and Twilight Daycare Collectible Babies lines of toys; and a privilege log. Hooper Decl., Ex. B at 11-14, 16.

Some of WowWee's document requests encompassed documents that could have been or

8

were requested from Roblox.[5] For example, documents related to Gamefam's meeting with Roblox in July 2022 was the subject of a discovery dispute submitted to the Court on November 15, 2023, four months after the Subpoena was issued. *See* Dkt. No. 140. The Court ultimately reviewed two documents related to this meeting *in camera* and concluded that they were protected attorney client communications. Dkt. No. 179 at 1-4. WowWee does not provide an adequate explanation of why it did not first seek to compel production of documents involving Roblox from Roblox before issuing the Subpoena to Gamefam.[6] *See Soto v. Castlerock Farming and Transport, Inc.*, 282 F.R.D. 492, 505 (E.D. Cal. 2012) ("In general, there is a preference for parties to obtain discovery from one another before burdening non-parties with discovery requests"). Additionally, WowWee issued the Subpoena just two months before the close of fact discovery. The Court finds that by, on a short time frame, requesting documents from Gamefam that could have been, or were, requested from a party to the Lawsuit, WowWee did not meet its burden of taking "reasonable steps to avoid imposing undue burden or expense" on Gamefam, and Gamefam is entitled to some reimbursement of costs and attorneys' fees under Rule 45(d)(1).

## II.     Mandatory Cost Shifting Under Rule 45(d)(2)(B)(ii)

Under Rule 45(d)(2)(B)(ii), "an order compelling production or inspection" must "protect a person who is neither a party nor a party's officer from significant expense resulting from compliance." Rule 45(d)(2)(B)(ii) "requires the district court to shift a non-party's costs of compliance with a subpoena, if those costs are significant." *Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013). Under section (d)(2)(B), a person commanded to produce documents "may serve on the party or attorney designated in the subpoena a written objection" which "must be served before the earlier of the time specified for compliance or 14 days after the subpoena is

---

[5] WowWee did narrow the scope of its requests to exclude email communications with a @wowwee.com domain. *See* Hooper Decl., Ex. B at 40-41.

[6] WowWee asserts that "the need and timing of WowWee's subpoena is a direct result of its inability to get relevant discovery from plaintiff Roblox concerning its communications and relationship with Gamefam." Dkt. No. 17 at 24. However, the Subpoena was issued months before WowWee and Roblox submitted discovery disputes to the Court concerning communications between Roblox and Gamefam.

1    issued."  If an objection is made, the serving party may move the court for an order compelling

2    production.  *Id.* § (d)(2)(B)(i).

3    "[O]nly two considerations are relevant" under this section: "(1) whether the subpoena

4    imposes expenses on the non-party, and (2) whether those expenses are 'significant.'"  *Legal Voice*,

5    738 F.3d at 1184 (adopting the rule set out by *Linder v. Calero–Portocarrero*, 251 F.3d 178, 182

6    (D.C. Cir. 2001)).  If the subpoena imposes significant expense on the non-party, the court "must

7    order the party seeking discovery to bear at least enough of the cost of compliance to render the

8    remainder 'non-significant.'"  *Id.* (citing *Linder*, 251 F.3d at 182).  However, *Legal Voice* did not

9    address the issue of cost shifting without a court order directing discovery against the non-party.

10   *See id.*

11   A court in this District has concluded that costs may be shifted under Rule 45(d)(2)(B) in

12   the absence of a court order "if the requesting party is on notice that the non-party will seek

13   reimbursement of costs."  *Spears v. First American Eappraiseit*, 5–08–CV–00868–RMW, 2014 WL

14   6901808, at *3 (N.D. Cal. 2014) (reasoning that this balances the "competing concerns of (1)

15   protecting a non-party who must respond to discovery, (2) encouraging negotiated resolution of

16   discovery disputes, and (3) providing requesting parties with adequate notice of the costs associated

17   with their discovery requests").  This Court agrees with the reasoning in *Spears* and, finding no

18   District case law to the contrary, concludes that costs may be shifted here because WowWee was

19   on notice that Gamefam would seek reimbursement of costs.  *See* Hooper Decl., Ex. B.

20   Courts considering a motion for cost-shifting by a non-party conduct a two-part inquiry.

21   First, courts determine what counts as an "expense," the touchstone being whether the expense

22   "result[s] from compliance" with a court order compelling production.  *U.S. v. McGraw-Hill*

23   *Companies*, 302 F.R.D. 532, 536 (C.D. Cal. 2014) (quoting Fed. R. Civ. P.  45(d)(2)(B)(ii)).

24   Reimbursable expenses may include some attorneys' fees, but Rule 45 does not require that all a

25   non-party's legal fees be reimbursed just because they are somehow related to responding to a

26   subpoena.  *Nitsch v. DreamWorks Animation SKG Inc.*, No. 5:14-cv-04062-LHK, 2017 WL 930809,

27   at *2 (N.D. Cal. 2017) (citation omitted).  Rather, "reimbursable fees are those that are necessary to

28   the third party's compliance and thus benefit the requesting party or are of assistance to the court."

10

1    *Id.* "An unreasonably incurred expense is not an expense resulting from compliance." *McGraw-*
2    *Hill*, 302 F.R.D. at 536 (internal quotation marks and citations omitted).

3    Next, courts determine whether those expenses are "significant," which is a "fact-specific
4    inquiry that depends on the circumstances of a particular case." *Id.* (citation omitted). "What
5    constitutes a significant cost is at the discretion of the district court." *Cornell v. Columbus*
6    *McKinnon Corporation*, 2015 WL 4747260, at * 2 (N.D. Cal. 2015) (internal quotation marks and
7    citations omitted).

8    WowWee asserts that even if some cost-shifting is appropriate, "the vast majority of the fees
9    and costs sought by Gamefam relate to fighting the Subpoena, not complying with it" and
10   Gamefam's fees and costs associated with complying were not "significant" under the
11   circumstances. Dkt. No 17 at 13. The Court examines each category of expenses in turn. To the
12   extent the Court concludes that costs incurred for the below activities are compensable, the Court
13   finds them sufficiently specific. *See* Christian Decl. at 7-10 (describing the work done in each
14   category of requested attorneys' fees).

### A. Whether Gamefam's Expenses Resulted From Compliance With the Subpoena

#### 1. Conferring With WowWee's Counsel on the Subpoena and Negotiating Limitations in Scope (21.9 hours, $11,745.87)

19   WowWee contends that this is not recoverable because a party may not recover fees incurred
20   litigating a subpoena. Dkt. No. 17 at 2, 15. WowWee cites *Stormans Inc. v. Selecky*, No. C07-5374
21   RBL, 2015 WL 224914 (W.D. Wash. Jan. 15, 2015) in support. *Stormans* was decided on remand
22   from the Ninth Circuit in *Legal Voice*. In *Stormans,* there were three rounds of briefing on motions
23   to compel production, three more rounds of briefing on appeal, and one more round of briefing on
24   remand. *Id.* at *2. The court held that "[t]here is no doubt that Rule 45 expenses resulting from
25   compliance may include some attorneys' fees. Complying with a subpoena will almost always
26   require some production-related tasks like document review, creating a privilege log, and drafting
27   protective orders." *Id.* at *5. The court went on to interpret Rule 45(d)(2)(B)(ii) compliance
28   expenses as "including attorneys' fees for production-related legal tasks, but not attorneys' fees for

11

litigating a subpoena." *Id.* The Court does not find *Stormans* persuasive here where there was no motion practice around the Subpoena and the parties cooperated to negotiate a reduced scope. Conferring and negotiating limitations in the Subpoena's scope is in fact conduct that is encouraged to avoid the need for litigation. The Court thus finds these expenses compensable.

### 2. Preparing Written Objections to the Subpoena (49.2 hours, $26,529.47)

WowWee similarly contends that this is not recoverable because a party may not recover fees incurred litigating a subpoena. Dkt. No. 17 at 15. WowWee additionally argues that it is unreasonable to spend 49.2 attorney hours drafting objections to 12 deposition topics and 10 document requests. *Id.* According to Gamefam, this category includes work done on the formal objections letter as well as the submission of written objections by email. Christian Decl. ¶ 17.

The Court finds that time spent preparing objections to the Subpoena is not work done in compliance with it. Additionally, the Court is concerned about the number of hours reported here, especially given the factual dispute about whether WowWee's counsel required Gamefam's counsel to submit the formal objections letter. *Compare* Christian Decl. ¶ 17 to Hooper Decl., Ex. B at 27. For these reasons, the Court does not find these costs reimbursable.

### 3. Locating, Identifying, and Collecting Potentially Responsive Documents Based on the Full Scope of the Subpoena (63.1 hours, $34,022.52)

WowWee first contends that these fees appear to be duplicative of the hiring CyberDuo and hiring Streamline Imaging categories below. Dkt. No. 17 at 16. WowWee argues this is separately not recoverable because Gamefam did not search per the narrowed scope of the Subpoena. *Id.*

The negotiations between Gamefam and WowWee over the scope of document production spanned many weeks, and the narrowing in scope appears to have resulted in large part from the number of responsive documents Gamefam located under the original requests. *See* Hooper Decl., Ex. B. The narrowed timeframe of June 15, 2022 through August 31, 2022 for Gamefam's internal documents and communications with Roblox and other third parties regarding specified topics does not appear in the email correspondence until August 30, 2023. *See id.* at 20. As of August 22, 2023

the timeframe for all email searches had been narrowed to May 1, 2022 to the present. *See id.* at 28. The Court finds this case distinguishable from *Balfour Beatty Infrastructure, Inc. v. PB & A, Inc.*, 319 F.R.D. 277, 283 (N.D. Cal. 2017), cited by WowWee, where the court found it significant that counsel had reviewed tens of thousands of pages of documents not limited to time frame agreed upon at the time. The Court does not find these fees duplicative. The Court thus finds these costs compensable.

### 4. Hiring CyberDuo to Locate, Collect, and Preserve Potentially Responsive Documents ($5,000)

WowWee again raises the concern that these fees appear duplicative and that there is insufficient detail to determine how much time CyberDuo spent on specific tasks. Dkt. No. 17 at 16. Gamefam's Chief Business Officer indicates that because the Subpoena required the production of preserved metadata, Gamefam had to retain CyberDuo's services to "locate, collect, preserve, and upload Gamefam's documents." Briceno Decl. ¶ 22. The Court likewise finds this to be production-related compensable cost.

### 5. Hiring Streamline Imaging to Review, Process, and Produce Responsive Documents ($9,481.90)

WowWee raises the same concerns as to the CyberDuo costs. Dkt. No. 17 at 16-17. Gamefam's Chief Business Officer indicates that Gamefam had to retain the Streamline Imaging services "to prepare to review, process, and produce responsive documents." Briceno Decl. ¶ 23. The Court likewise finds this to be production-related compensable cost.

### 6. Reviewing Documents for Responsiveness, Including Identifying Confidentiality Obligations (59.9 hours, $32,402.40)

WowWee asserts that it never requested Gamefam identify third-party confidential information and that it provided Gamefam with a copy of the protective order in the Lawsuit. Dkt. No. 17 at 17. WowWee contends that fees relating to identifying confidentiality obligations were

for Gamefam's own benefit and therefore not compensable. *Id.* WowWee also argues that 59.9 attorney hours to review documents for responsiveness it not reasonable. *Id.*

Courts in this circuit have concluded that fees incurred in production-related tasks like document review are compensable expenses resulting from subpoena compliance. *Nitsch*, 2017 WL 930809, at *2. The Court further concludes that efforts to protect confidentiality under the circumstances presented here were not done solely for Gamefam's "sole benefit and peace of mind" but were rather the result of compliance with the Subpoena. *See McGraw-Hill*, 302 F.R.D. at 536. These costs are thus compensable.

**7. Assembling, Preparing, and Redacting Responsive Documents for Production Based on Negotiated Subpoena Limitations** (17.2 hours, $9,315.69)

The Court likewise finds that this is a compensable, production related task.

**8. Assembling and Producing the Privilege Log** (12.8 hours, $6,885.51)

Courts in this circuit have concluded that fees incurred in production-related tasks, including creating a privilege log, are compensable expenses resulting from subpoena compliance. *Nitsch*, 2017 WL 930809, at *2. The Court believes that 12.8 hours spent preparing a privilege log is reasonable given the laborious nature of the task. The Court thus finds this cost compensable.

**9. Preparing For, Attending, and Defending the Deposition, and Processing the Deposition Transcript** (56.4 hours, $30,377.25)

WowWee "does not disagree that these costs *may* be eligible for reimbursement," but argues that Gamefam seeks an amount that is objectively unreasonable given that the deposition lasted for 6 hours, and that time spent processing the deposition transcript is not recoverable because these activities were for the benefit of Gamefam only. Dkt. No. 17 at 18. The Court disagrees. Reviewing the transcript for "confidentiality protections and errors, and the preparation and submission of an errata sheet to complete the transcript review" are not services provided by an attorney "for the non-

1    party's sole benefit and peace of mind," but rather are needed to ensure the accuracy of the litigation
2    process. *See* Christian Decl. ¶ 22; *McGraw-Hill*, 302 F.R.D. at 536 (citation omitted). The time
3    spent preparing for and attending the deposition directly resulted from compliance with the
4    Subpoena. The Court thus finds these expenses compensable.

### 10. Final Deposition Transcript Charge ($2,734.20)

The Court finds this compensable for the same reason as stated in subsection 9.

### 11. Negotiating, Researching, Assembling, and Preparing This Motion (94.9 hours, $51,236.29)

Gamefam is not entitled to costs related to its quest for reimbursement, including costs related to the pending motion. *See In re Fresh and Process Potatoes Antitrust Litigation*, 2016 WL 11784717 at *7; *see also Stormans*, 2015 WL 224914 at *5 (finding attorneys' fees for litigating a subpoena are not expenses of compliance under Rule 45(d)(2)(B)(ii)).

### 12. Costs Incurred for Salary/Wage Time Expended by Gamefam Employees ($7,600)

Lastly, Gamefam requests reimbursement of costs incurred for salary/wage time expended by Gamefam employees on Subpoena-related tasks. Dkt. No. 1 at 17. This includes: administrative and clerical support from Gamefam employees ($50 per hour fee for 5 hours); Ricardo Briceno, Gamefam's Chief Business Officer ($300 per hour fee for 23 hours); Justin Peress, Gamefam's Head of Finance ($250 per hour fee for 1 hour); and Alexandra Guglielmino, Gamefam's Sr. Vice President, Growth ($200 per hour fee for 2 hour). *Id.* WowWee does not contest these costs and the Court finds them compensable. *See Computer Corp. v. Packard Bell Elecs., Inc.*, 163 F.R.D. 329, 339 (N.D. Cal. 1995) (finding that a third-party is "entitled to be compensated at a reasonable hourly rate for its employees', including in-house paralegals', time in searching for, reviewing for privileged material and producing responsive documents, and in sitting for deposition").

In sum, the Court finds that **$149,565.34** of the above-listed costs resulted from compliance

1    with the Subpoena and are thus compensable.[7]

### B.      Whether These Expenses Are Significant

In determining whether expenses are "significant," courts "should consider the ability of the producing party to bear the costs of production." *Mc-Graw-Hill*, 302 F.R.D. at 326. WowWee also points the Court to a decision by this Court that considered whether the non-party was the sort of disinterested party that Rule 45 is aimed at protecting. *See Cornell v. Columbus McKinnon Corp.*, No. 13-CV-02188-SI, 2015 WL 4747260, at *5 (N.D. Cal. Aug. 11, 2015). WowWee contends that Gamefam was substantially involved in the facts underlying the Lawsuit and is thus "not the sort of disinterested party" that Rule 45 protects. *Id.*

In *Cornell*, the subpoenaed non-party, FedEx, was the plaintiff's employer at the time of the accident at issue in the litigation. *Id.* at *1. FedEx had filed a lien against any judgment or settlement in plaintiff's favor to recoup previously paid workers' compensation benefits. *Id.* at *3. The court began by noting that this was "an anomalous case for the application of amended Rule 45, since [the non-party] seeking relief . . . actually has an interest in the outcome of the case that may well be as great as that of the parties." *Id.* at *3. The court noted that if the plaintiff were to prevail, FedEx could likely "recover more than its cost of compliance with the parties' discovery requests" and that because the plaintiff was a FedEx employee working at a FedEx facility at the time of the injury, the outcome of the case could also "affect FedEx's employee training, safety policies, and future exposure to liability." *Id.* The court further noted that FedEx "plausibly had standing to intervene in this action." *Id.* Given FedEx's "direct interest in the outcome of the litigation" and its ability to bear some costs, the court concluded that the expenses FedEx incurred did not impose a "significant burden" warranting Rule 45's protections. *Id.* at *5.

Gamefam responds that it has no such interest in the outcome of the Lawsuit because it does not stand to collect any money or otherwise benefit from the outcome and faces no liability with

---

[7] The Court further finds that the hourly billing rates of Gamefam's attorneys are in line with the prevailing rates in the relevant market and that Gamefam has provided sufficient documentation of this. *See* Dkt. No. 23 at 13-15. Gamefam's legal team is based in Portland, Oregon.

respect to the subject matter of the Lawsuit, regardless of its outcome. Dkt. No. 23 at 4-5.[8] Gamefam further argues that the "mere appearance of Gamefam's name in pleadings prepared by counsel for WowWee and Roblox reflects strategic legal choices made by the parties' attorneys and is not relevant to the issue of whether Gamefam has a personal and direct interest in the outcome of the Lawsuit." *Id.*

The Lawsuit in part arose out of WowWee and Gamefam's collaboration and Gamefam figures heavily in discovery disputes between the Lawsuit parties. Gamefam possesses documents relevant to the Lawsuit and Gamefam personnel communicated with WowWee personnel about whether their collaboration was in violation of Roblox's Terms of Use shortly before the Lawsuit was filed. However, the Court disagrees with WowWee that this relationship prevents any award of fees and costs. Roblox did not sue Gamefam, the discovery provided by Gamefam directly benefitted WowWee, and WowWee does not contend that Gamefam has a financial interest in the outcome of the Lawsuit. The Court also finds significant that documents were requested from Gamefam that could have been, and were, requested from Roblox. In sum, the Court does not find that Gamefam has the type of interest in the outcome of the Lawsuit that would bring it within the ambit of the "anomalous" *Cornell* case. *See Cornell*, 2015 WL 4747260, at *3.[9]

---

[8] WowWee allegedly agreed to fully indemnify Gamefam in a Key Term Sheet between WowWee and Gamefam effective October 13, 2023 and produced by Gamefam in response to the Subpoena. Dkt. No. 23 at 4. Upon request, Gamefam will provide the Key Term Sheet for Court review. In the Key Term Sheet, "WowWee represented and warranted to Gamefam that the toys and related intellectual property would not infringe any third-party rights (including Roblox's rights) and agreed to fully indemnify, defend, and hold Gamefam harmless from any such claims." *Id.* at 6. Gamefam was allegedly "not responsible for assuring or affirming that WowWee was not infringing Roblox's intellectual property." *Id.* In its reply to the present motion, Gamefam argues that under the Key Term Sheet WowWee must indemnify and hold Gamefam harmless from any costs arising from WowWee's alleged breach, and that this includes Gamefam's costs incurred in responding to the Subpoena. Dkt. No. 23 at 10. The Court does not reach this argument because it was only raised in the reply.

[9] WowWee also cites *Balfour Beatty Infrastructure, Inc. v. PB & A, Inc.*, 319 F.R.D. 277 (N.D. Cal. 2017) in support of its argument. There, the plaintiff based its claims against the defendant in part on the defendant's alleged failure to properly design an access trestle. *Id.* at 282. The defendant asserted that the project owner hired the third-party as consulting engineers and that the third-party reviewed the access trestle design. *Id.* at 282-83. The court did not find that this relationship precluded cost-shifting, only noting that the third-party was "perhaps [] not in the typical position of a completely uninterested nonparty." *Id.* at 282. The court further noted that there was no evidence that the third-party had a financial interest in the case. *Id.* at 282. The Court does not find *Balfour* to relate persuasively to this case.

The Court further finds that the **$149,565.34** in compensable expenses is significant in light Gamefam's ability to bear the costs or production. Gamefam devoted significant resources to complying with the Subpoena on a short time frame and hired outside counsel and services to respond. Gamefam's Chief Business Officer has declared that Subpoena-related costs exceeded Gamefam's legal budget line item and has detailed the financial impact responding to the Subpoena had on the company. *See* Briceno Decl. ¶¶ 15-19.

### III.  Associated Administrative Sealing Motions

WowWee filed an administrative motion to file under seal portions of its response to Gamefam's motion. Dkt. No. 15. Gamefam does not oppose this administrative motion. Dkt. No. 19. The Court GRANTS this administrative motion to file under seal.

WowWee also filed an administrative motion to consider whether another party's material should be sealed pursuant to Local Rule 79-5(f). Dkt. No. 16. Gamefam responded, indicating that it does not oppose the public filing of the documents subject to this administrative motion. Dkt. No. 20. This administrative sealing motion is therefore DENIED. However, the portions of WowWee's opposition to Gamefam's motion highlighted in yellow at Dkt. No. 16-2 will remain under seal because these portions of the letter are also sealed pursuant to WowWee's administrative sealing motion at Dkt. No. 15.

### CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby ORDERS WowWee to reimburse Gamefam **$149,565.34** in costs associated with responding to the Subpoena under Rule 45.

**IT IS SO ORDERED**.

Dated: March 18, 2024

SUSAN ILLSTON
United States District Judge