Michael S. Elkin (admitted *pro hac vice*)
MElkin@winston.com
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166-4193
Telephone:    (212) 294-6700

Jennifer A. Golinveaux (SBN: 203056)
JGolinveaux@winston.com
Thomas J. Kearney (SBN 267087)
TKearney@winston.com
Winston & Strawn LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
Telephone:    (415) 591-1000

Diana Hughes Leiden (SBN 267606)
dhleiden@winston.com
Winston & Strawn LLP
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
Telephone:    (213) 615-1700

Michael D. Bednarek (admitted *pro hac vice*)
michael@bednareklegal.com
Bednarek Legal, PLLC
1100 N. Glebe Road, Suite 1010
Arlington, VA 22201
Telephone:    (202) 997-1665

Attorneys for Defendants
WOWWEE GROUP LIMITED, WOWWEE
CANADA, INC., WOWWEE USA, INC., and
GRAMPS GOODS, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

ROBLOX CORPORATION,

    Plaintiff,

    v.

WOWWEE GROUP LIMITED, et al.,

    Defendants.

Case No. 3:22-cv-04476-SI

Hon. Susan Illston

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE TESTIMONY OF DR. BRUCE ISAACSON; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Hearing: May 24, 2024, 10:00 a.m.

**REDACTED VERSION OF DOCUMENT FILED UNDER SEAL**

## NOTICE OF MOTION AND MOTION TO EXCLUDE THE TESTIMONY OF DR. BRUCE ISAACSON

TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 24, 2024 at 10:00 a.m., via Zoom webinar, Defendants WowWee Group Limited, WowWee Canada, Inc., WowWee USA, Inc., and Gramps Goods, Inc. (collectively, "Defendants" or "WowWee") move pursuant to Federal Rules of Evidence 702, 402, and 403 and the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596–97 (1993), for an order excluding the opinions and testimony of Plaintiff Roblox Corporation's ("Plaintiff" or "Roblox") survey expert Dr. Bruce Isaacson reflected in his Expert Report Submitted by Dr. Bruce Isaacson Measuring the Messages Conveyed By Ads For My Avastars Dolls, dated December 5, 2023.

This Motion is based upon this Notice of Motion and Motion and the accompanying Memorandum of Points and Authorities in support thereof, the pleadings and papers on file in this matter, and such other and further submission, evidence, and argument as may be presented to the Court prior to or at the time of hearing on this Motion.

## STATEMENT OF ISSUES TO BE DECIDED

Whether Dr. Bruce Isaacson's opinions and testimony reflected in his Expert Report Submitted by Dr. Bruce Isaacson Measuring the Messages Conveyed By Ads For My Avastars Dolls, dated December 5, 2023, are to be excluded pursuant to Federal Rules of Evidence 702, 402, and 403 and the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596–97 (1993), on the basis that the surveys that he conducted are neither methodologically sound nor relevant to any issue or any claim in this case. Specifically, Dr. Isaacson's surveys tested two TikTok videos that were admittedly removed from public view years ago and that consumers have not been exposed to since 2022, and his surveys did not measure any lasting consumer perception of those two disabled videos or any other advertising. Dr. Isaacson's opinions lack any connection to Plaintiff's false advertising claim, and he concededly did not test any issue relevant to Plaintiff's other claims. Permitting Dr. Isaacson to testify regarding these two flawed, irrelevant surveys would only serve to waste time and confuse the jury.

1

2

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................... 1

II.   STATEMENT OF FACTS .................................................................................. 2

III.  LEGAL STANDARD ......................................................................................... 4

IV.  ARGUMENT ...................................................................................................... 5

    A.    Dr. Isaacson's Surveys Tested Disabled Advertisements and Are Not Relevant to Liability or Roblox's Requested Relief ....................................... 5

    B.    Dr. Isaacson's Advertising Communications Survey Did Not Test Confusion or Deception and Is Not Relevant to Liability ............................ 7

        1.    Three of the four messages tested by Dr. Isaacson accurately promoted the My Avastars dolls in conjunction with the My Avastars:RP Experience.................................................................... 9

        2.    The fourth "message" that Dr. Isaacson opines is associated with the advertising does not indicate an actionable level of confusion or deception................................................................................... 10

    C.    Dr. Isaacson's "Advertising Communications" Survey Suffers From Several Other Flaws ..................................................................................... 11

        1.    The survey used leading questions, and improper control video, and likely resulted in demand effects ................................................ 12

        2.    Dr. Isaacson did not screen for social media usage, and respondents may never have been on social media ........................ 15

        3.    The control statements are not realistic ........................................... 15

    D.    Dr. Isaacson's Materiality Survey Is Fatally Flawed ................................. 16

    E.    Dr. Isaacson's Opinions Relate Only to Roblox's False Advertising Claims, For Which Roblox Has Proffered No Damages Theory................. 17

V.   CONCLUSION.................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Art Attacks Ink, LLC v. MGA Ent. Inc.*,
   581 F.3d 1138 (9th Cir. 2009) ..........................................................................8, 9

*Cairns v. Franklin Mint Co.*,
   24 F. Supp. 2d 1013 (C.D. Cal. 1998) ...............................................................11

*Daubert v. Merrell Dow Pharms., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ...............................................................................4

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)......................................................................................4, 5, 7

*Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*,
   2022 WL 254348 (N.D. Cal. Jan. 27, 2022) ......................................................14

*In re Elysium Health-ChromaDex Litig.*,
   2022 WL 421135 (S.D.N.Y. Feb. 11, 2022).................................................4, 11

*Exeltis USA Inc. v. First Databank, Inc.*,
   2020 WL 7025089 (N.D. Cal. Nov. 30, 2020) .....................................................4

*FTC v. Wellness Support Network, Inc.*,
   2013 U.S. Dist. LEXIS 144140 (N.D. Cal. Oct. 4, 2013)....................................7

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1977)..............................................................................................4

*Int'l Med. Devices, Inc. v. Cornell*,
   2023 WL 4295194 (C.D. Cal. Feb. 13, 2023).......................................................9

*Kournikova v. Gen. Media Commc'ns Inc.*,
   278 F. Supp. 2d 1111 (C.D. Cal. 2003) ........................................................5, 15

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)..............................................................................................4

*Kwan Software Eng'g, Inc. v. Foray Techs., LLC*,
   2014 WL 572290 (N.D. Cal. Feb. 11, 2014) ....................................................4, 5

*Little Oil Co. v. Atl. Richfield Co.*,
   852 F.2d 441 (9th Cir. 1988) ..............................................................................18

*Lust By & Through Lust v. Merrell Dow Pharms., Inc.*,
   89 F.3d 594 (9th Cir. 1996) ..................................................................................4

*Luxul Tech. Inc. v. NectarLux, LLC*,
   2016 WL 3345464 (N.D. Cal. June 16, 2016) ...................................................................17

*Montera v. Premier Nutrition Corp.*,
   2022 WL 1225031 (N.D. Cal. Apr. 26, 2022) .....................................................................4

*Mullins v. Premier Nutrition Corp.*,
   178 F. Supp. 3d 867 (N.D. Cal. 2016) ..........................................................................7, 14

*Neo4j, Inc. v. PureThink, LLC*,
   2023 WL 7093805 (N.D. Cal. Oct. 25, 2023).....................................................................11

*Procter & Gamble Pharms., Inc. v. Hoffmann-LaRoche Inc.*,
   2006 WL 2588002 (S.D.N.Y. Sept. 6, 2006)......................................................................13

*Rearden LLC v. Rearden Com., Inc.*,
   683 F.3d 1190 (9th Cir. 2012) .............................................................................................8

*Reinsdorf v. Skechers U.S.A.*,
   922 F. Supp. 2d 866 (C.D. Cal. 2013) ....................................................................6, 7, 11, 15

*Sec. Alarm Fin. Enters., L.P. v. Alder Holdings, LLC*,
   2017 WL 5248181 (D. Alaska Feb. 21, 2017).....................................................................11

*Senne v. Kan. City Royals Baseball Corp.*,
   315 F.R.D. 523 (N.D. Cal. 2016), *on reconsideration in part*, 2017 WL 897338
   (N.D. Cal. Mar. 7, 2017), *aff'd in part, rev'd in part and remanded*,
   934 F.3d 918 (9th Cir. 2019) .............................................................................................12

*Townsend v. Monster Beverage Corp.*,
   303 F. Supp. 3d 1010 (C.D. Cal. 2018) ...........................................................................5, 8

*United States v. King*,
   703 F. Supp. 2d 1063 (D. Haw. 2010)..................................................................................7

*William H. Morris Co. v. Grp. W, Inc.*,
   66 F.3d 255 (9th Cir.), *supplemented sub nom. William H. Morris Co. v. Grp. W. Inc.*, 67 F.3d 310
   (9th Cir. 1995)....................................................................................................................10

**Statutes**

California's False Advertising Law ...........................................................................................2

Lanham Act................................................................................................................................2

**Other Authorities**

Fed. R. Evid. 402 ......................................................................................................................1

Fed. R. Evid. 403 ...............................................................................................................1, 4, 5

iv

Fed. R. Evid 702. .................................................................................................1, 4

**Publications**

David H. Bernstein & Bruce P. Keller, *Survey Evidence in False Advertising Cases*, in Trademark and
    Deceptive Advertising Surveys,
    209 (Shari S. Diamond & Jerre B. Swann eds., 2nd ed. 2022) .......................................5, 15

Lester Horwitz & Ethan Horwitz, Intellectual Property Counseling and Litigation,
    § 76.04 (2023) ..................................................................................................12

E. Deborah Jay, *Ten Truths of False Advertising Surveys*,
    103 Trademark Rep. 1116 (2013) ....................................................................13

Tom De Leyn et al., *In-between child's play and teenage pop culture: tweens, TikTok & privacy*,
    25 J. of Youth Studies (2021) ..........................................................................15

Richard E. Nisbett & Timothy D. Wilson, *Telling more than we can know: Verbal reports on mental
    processes*, Psychological Rev. 84, 231 (1977) ................................................16

Mike Rappeport, *Design Issues and the Value of Multiple Controls*, in Trademark and Deceptive
    Advertising Surveys,
    259 (Shari S. Diamond & Jerre B. Swann eds., 2nd ed. 2022) .......................12

McCarthy on Trademarks and Unfair Competition § 32:193 (5th ed.) ............................11

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3

Pursuant to Federal Rules of Evidence 702, 402, and 403, Defendants WowWee Group Limited,

4    WowWee Canada, Inc., WowWee USA, Inc., and Gramps Goods, Inc. ("Defendants" or "WowWee"),

5    respectfully request that the Court exclude the opinions and testimony of Plaintiff Roblox Corporation's

6    ("Plaintiff" or "Roblox") survey expert Dr. Bruce Isaacson reflected in his Expert Report Submitted by

7    Dr. Bruce Isaacson Measuring the Messages Conveyed By Ads For My Avastars Dolls, dated December

8    5, 2023. Dr. Isaacson's "advertising communications" and "materiality" surveys tested two TikTok

9    videos that were *removed* from that platform before Roblox filed its operative pleading in this case.

10    Consumers have not been exposed to the tested videos for years and, as Dr. Isaacson concedes, his survey

11    is not relevant to any other advertising, or any lasting consumer perception of the two TikTok videos

12    after they were removed. Further, Dr. Isaacson's survey did not measure whether consumers are likely

13    to be deceived by WowWee's advertising, because most of the relevant "messages" he opines that

14    consumers would take away from the videos were literally true at the time they were made, when

15    WowWee was promoting the My Avastars fashion dolls in connection with a companion game in the

16    metaverse. Dr. Isaacson's testimony is therefore irrelevant to Roblox's false advertising claim. And

17    because Dr. Isaacson did not test confusion or secondary meaning, his testimony would have no bearing

18    on Roblox's trademark or trade dress infringement claims.

19    Dr. Isaacson's surveys also suffer from a number of additional flaws that render them unreliable.

20    Dr. Isaacson's advertising communications survey used leading questions and created demand effects,

21    presented respondents with unrealistic control statements, did not screen for whether respondents would

22    have possibly been exposed to the test advertisements on social media, and used control videos with a

23    prominent disclaimer that likely primed respondents to select answers referencing Roblox. With regard

24    to the "materiality" survey, in addition to testing irrelevant videos, the design of the materiality survey

25    was flawed because it asked respondents to indicate whether certain messages would make them more

26    or less likely to purchase fashion dolls, without first filtering respondents to those who actually took those

27    messages away from the advertisements. And the materiality survey asked respondents to self-report

28    hypothetical purchasing behavior, which is not a reliable indicator of actual behavior.

If there was any doubt about the admissibility of Dr. Isaacson's opinions, it is put to rest by the fact that Roblox is not seeking any relief that the Court could grant relating to the only claims potentially relevant to his survey—false advertising.[1] As set forth below, Roblox has not come forward with any theory that is has suffered harm or damages from WowWee's historical references to Roblox in its advertisements for the My Avastars fashion dolls, and any request for injunctive relief for these claims is moot because WowWee ceased referring to Roblox in connection with the dolls in 2022. *See* concurrently filed Mot. for Summ. J. at 4–5; R. Yanofsky Decl. ¶ 4. Dr. Isaacson is a well-respected and well-credentialed survey expert, and permitting him to testify about the effects of two pieces of irrelevant advertising (which also relate solely to a claim disconnected from any potential relief Roblox could obtain) and offer two flawed surveys predicated on those same videos would only serve to waste time, confuse the jury, and prejudice WowWee.

## II.    STATEMENT OF FACTS

Dr. Isaacson submitted two reports in this case: the Expert Report Submitted by Dr. Bruce Isaacson Measuring the Messages Conveyed By Ads For My Avastars Dolls, dated December 5, 2023 (the "Isaacson Report"); and the Report of Dr. Bruce Isaacson In Response to Secondary Meaning and Likelihood of Confusion Surveys Submitted By David Franklyn, dated January 23, 2024.

As detailed in the Isaacson Report, Dr. Isaacson conducted two surveys: an "advertising communications" survey and a "materiality" survey. The "advertising communications" survey "measured whether certain elements in advertisements from WowWee communicate or imply that My Avastars dolls can be used with Roblox, are made with permission from Roblox, or are connected to or affiliated with Roblox in some other manner." Ex.[2] 46, ¶ 26. This survey tested two short videos that WowWee's Vice President of Brand Development and Creative Strategy, Sydney Wiseman, posted to her personal TikTok account in June 2022. *Id*. ¶ 27; Dkt. 36 at 26 n.18, 31 n.25; *see also* Exs. 102–05. Dr. Isaacson refers to these videos as the "Great Doll Line" video and the "Fun to Customize" videos. Ex. 46, ¶ 27. While certain respondents to the "advertising communications" survey viewed one of these

---

[1] In the First Amended Complaint, Roblox has asserted a false advertising claim under the Lanham Act (*see* Dkt. 36 at 52–53) and under California's False Advertising Law (*see* Dkt. 36 at 61–62) predicated on allegations that WowWee's references to Roblox on social media deceived consumers.
[2] Unless otherwise noted, "Ex. __" refers to the exhibits attached to the Declaration of Diana Hughes Leiden, submitted herewith.

DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF DR. BRUCE ISAACSON    CASE NO. 3:22-CV-04476-SI

two "test" videos, other respondents viewed the "control" version of either the Great Doll Line video or the Fun to Customize video. *Id*. ¶ 35. The control videos are similar to their corresponding test videos, except that references to Roblox are either removed or altered in the control videos, and the control videos additionally include a prominent written and verbal disclaimer that "My Avastars Dolls are not a part of Roblox and cannot be customized or used in Roblox." *Id*. ¶ 36.

Respondents to the "advertising communications" survey were asked a series of open-ended questions about the messages that the videos communicate, and were also asked to indicate whether 11 statements were communicated by the advertisement they viewed. *Id.* ¶ 43. Four of these statements were being tested by the survey, five statements were "distractors," and two were "control" statements. *Id*. ¶¶ 72–73. Dr. Isaacson opines that the control statements and control videos adjusted survey measures for the effect of extraneous influences, inattention, and bias. *Id*. ¶ 74. Based on the results of the "advertising communications" survey, Dr. Isaacson concludes "that the elements from WowWee's advertising for My Avastars dolls that were measured in [his] survey—the use of the word 'Roblox' in the narration and on-screen text, the screen recordings of the Roblox platform, and the reference to the My Avastars: RP experience on Roblox—communicate or imply that My Avastars dolls have a connection to or affiliation with Roblox." *Id*. ¶ 52.

Dr. Isaacson also conducted a "materiality" survey of a different pool of respondents, which "measured whether statements relevant to advertisements for My Avastars dolls are material, meaning that they are likely to influence consumer decisions about whether to purchase those dolls." *Id*. ¶ 128. The "materiality" survey tested the same two videos as the advertising communications survey; however, this survey only used control statements as opposed to control videos. *Id*. ¶¶ 129, 131. Respondents in this survey were asked how each statement impacted their decision to purchase the My Avastars dolls, if at all. *Id*. ¶ 133. Dr. Isaacson concludes that four of the messages ("You can use this doll as an avatar in Roblox," "This doll is made with permission from Roblox," "You can customize this doll's appearance in Roblox," and "You can buy hair and clothes for this doll in Roblox"), "are all material to consumer purchasing behavior, meaning that they are likely to affect consumer purchasing behavior." *Id*. ¶ 167. He also concludes "that respondents are more likely to purchase the My Avastars dolls if they believe that the dolls are compatible with Roblox or made with permission from Roblox." *Id*.

3

## III.    LEGAL STANDARD

"Under Rule 702, a court may permit opinion testimony from an expert only if '(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.'" *Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, 2014 WL 572290, at *4 (N.D. Cal. Feb. 11, 2014) (quoting Fed. R. Evid. 702); *see also In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *1 (S.D.N.Y. Feb. 11, 2022). "Survey evidence must meet the requirements under Federal Rule of Evidence 702." *Kwan*, 2014 WL 572290, at *4. The proponent of the expert carries the burden to prove the expert's testimony is admissible. *Lust By & Through Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). On December 1, 2023, Rule 702(d) was revised to clarify that the proponent of the expert opinion (here, Roblox) must establish "that it is more likely than not that … the expert's opinion reflects a *reliable application of principles and methods to the facts of the case*." (emphasis added).

Additionally, "[a] court can exclude a survey suffering from substantial methodological flaws under either Rule 403, which concerns relevance, or Rule 702." *Montera v. Premier Nutrition Corp.*, 2022 WL 1225031, at *4 (N.D. Cal. Apr. 26, 2022). And Rule 702 makes *inadmissible* expert testimony of conclusions with no scientific basis. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995).

Federal Rule of Evidence 702 requires a trial court to play a "gatekeeping role" in evaluating whether proposed expert testimony should be admitted at trial. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596–97 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connecting to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1977). Rather, the proffered testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591. "Expert testimony is admissible under Rule 702 if the expert is qualified and if the testimony is both relevant and reliable." *Exeltis USA Inc. v. First Databank, Inc.*, 2020 WL 7025089, at *2 (N.D. Cal. Nov. 30, 2020). "Expert

testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. This "gatekeeping" function is important to the integrity of the trial process because "[e]xpert evidence can be both powerful and quite misleading." *Id*. at 595 ("Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.") (citations omitted).

## IV.    ARGUMENT

### A.    Dr. Isaacson's Surveys Tested Disabled Advertisements and Are Not Relevant to Liability or Roblox's Requested Relief

"The failure of a survey to approximate actual marketplace conditions can provide grounds for inadmissibility." *Kwan*, 2014 WL 572290, at *4. For this reason, advertising surveys should expose respondents to advertising as it was presented to consumers. *See* David H. Bernstein & Bruce P. Keller, *Survey Evidence in False Advertising Cases*, in Trademark and Deceptive Advertising Surveys, 209 (Shari S. Diamond & Jerre B. Swann eds., 2nd ed. 2022) ([S]urveys in false advertising cases … must be tailored to reflect the nature of the advertising claim in dispute."); *Kwan*, 2014 WL 572290, at *4 (finding that the proponent of the expert testimony "failed to meet its burden of showing reliability and relevance of the survey" in part because it did "not show[] that any of the members of the survey [were] people who would see the alleged misrepresentations"); *Kournikova v. Gen. Media Commc'ns Inc.*, 278 F. Supp. 2d 1111, 1125 (C.D. Cal. 2003) (finding a survey "fundamentally flawed" where the majority of respondents would not have been exposed to the test advertisement, and the respondents only viewed portions of the publication at issue, rather than the totality of the publication that consumers would have encountered). For example, in *Townsend v. Monster Beverage Corp*., 303 F. Supp. 3d 1010, 1019–20 (C.D. Cal. 2018), the plaintiff retained an expert to design and implement an online survey to assess consumers' perception of advertising claims made relating to certain varieties of Monster energy drinks. *Id*. The court excluded the expert's opinions because the survey did not accurately reproduce the challenged statement. *Id*. at 1021–22. The court held that while some challenges to an expert's testimony and reports affect the weight, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id*. at 1019.

Here, Dr. Isaacson did not conduct an investigation into WowWee's advertising practices and

was generally unaware of how WowWee promoted and advertised the My Avastars dolls. Ex. 47, 57:19–58:16. Further, despite reviewing more than 220 examples of social media posts, user comments, online shopping pages, and customer reviews of the dolls (many of which continued to be available online after this case was filed),[3] Dr. Isaacson did not present any of these to respondents. Ex. 47, 41:3–42:11, 43:1–10. Instead, at the instruction of counsel, Dr. Isaacson tested only the "Great Doll Line" video and the "Fun to Customize" video, two short videos that were not live during the relevant time period and are, therefore, not relevant stimuli. *Id.* 68:20–69:1. Both of these videos were posted by Ms. Wiseman on TikTok in June 2022. However, following its receipt of Roblox's cease-and-desist letter in July 2022, WowWee made a good-faith effort to remove any reference to Roblox from all of its marketing channels. R. Yanofsky Decl. ¶ 4. As part of that effort, both the Great Doll Line video and the Fun to Customize video were removed from TikTok in September 2022. *See* Ex. 46 at 11 n.26; Ex. 47, 71:13–21. The First Amended Complaint—the operative complaint in this action—was later filed on September 19, 2022. *See* Dkt. 36. Dr. Isaacson was well aware of this when he conducted his survey. *See* Ex. 46 at 11 n.26.

Because Dr. Isaacson tested two advertisements that WowWee removed in 2022, the survey he conducted from October 27, 2023 to November 5, 2023 did not present respondents with advertisements that were actually displayed and available to consumers that he surveyed during the relevant time period, nor would any of the survey respondents have even potentially seen them since 2022, and the survey is both unreliable and irrelevant. *See Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 877 (C.D. Cal. 2013) (survey was fatally flawed in part because the expert did not "determine whether the ads used in the survey had actually been displayed in participants' home regions" and made no effort to "compare the distribution of participants to the distribution of Skechers' advertising and sales").

Further, Dr. Isaacson concedes that he is not offering an opinion as to whether the videos tested in the surveys had any lasting effect on consumer perception, or as to any advertising apart from the two

---

[3] Examples of advertisements that Dr. Isaacson reviewed that were live after the First Amended Complaint was filed in September 2022 are a video posted on Instagram on September 26, 2022, Ex. 53, ROBLOX-AVASTARS-00042380 (https://www.instagram.com/p/Ci-tMGUpkdV/), which shows someone unboxing and dressing their My Avastars doll; a video posted on TikTok on November 17, 2022, Ex. 54, ROBLOX-AVASTARS-00042457 (https://www.tiktok.com/@sydwiseman/video/7167042931415715078), which advertises that the My Avastars dolls have "[s]hort hair that works for all genders"; and a TikTok video posted on November 19, 2022, Ex. 55, ROBLOX-AVASTARS-00042462 (https://www.tiktok.com/@sydwiseman/video/7167895899492863238), which shows Ms. Wiseman dressing a My Avastars doll.

videos he tested:

> Q: So just focusing on – on the two videos that you tested in your advertising communications survey, the great – great doll line and the fun to customize video, once those were removed from the TikTok platform in September of 2022, those were no longer accessible to consumers; right?
> A: That's my understanding.
> Q: Okay. Are you offering any opinion on any effect that those videos continued to have on consumers after they were removed from the TikTok platform?
> A: No.

Ex. 47, 81:16–82:2.

> Q: And you're not offering an opinion about any advertising for the My AvaStars fashion dolls other than those two videos; correct?
> A: Correct.

*Id*. at 82:17–20. Because Dr. Isaacson did not test any relevant stimuli and is not opining on that the two historical advertisements had any lasting impact on consumers, Dr. Isaacson's opinions regarding the "advertising communications" survey should be excluded. *See Reinsdorf*, 922 F. Supp. 2d at 877. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. Because Dr. Isaacson is a well-credentialed expert, there is a high risk that his testimony would be unduly prejudicial and mislead the jury. *See FTC v. Wellness Support Network, Inc.*, 2013 U.S. Dist. LEXIS 144140, at *30 (N.D. Cal. Oct. 4, 2013) (there are "special dangers inherent in scientific expert testimony. In particular, expert testimony can be both powerful and quite misleading because of the difficulty in evaluating it.") (citing *Daubert*, 509 U.S. at 591, 595); *United States v. King*, 703 F. Supp. 2d 1063, 1075 (D. Haw. 2010) ("[T]here is often an inherent danger with expert testimony unduly biasing the jury '[b]ecause of its aura of special reliability and trust.'") (quoting *United States v. Amaral*, 488 F.2d 1148 (9th Cir. 1973)).

## B. Dr. Isaacson's Advertising Communications Survey Did Not Test Confusion or Deception and Is Not Relevant to Liability

"'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" *Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 888 (N.D. Cal. 2016) (quoting *Daubert*, 509 U.S. at 590). Not only did Dr. Isaacson's advertising communication survey test irrelevant advertisements that were not seen by any consumers since September 2022, but it also failed to test any elements that Roblox must prove to succeed on its claims or defenses in this action. Liability for a false

advertising claim requires that a "defendant's particular representations are *false or likely to mislead* a reasonable consumer." *Townsend*, 303 F. Supp. 3d at 1021 (emphasis added). Dr. Isaacson concedes that his advertising communications survey did not test whether the messages in the Great Doll Line and Fun to Customize videos were false or misleading. Ex. 47, 91:18–23 ("I'm not offering any opinions about what is literally true or what is literally false. … I'm only offering opinions about – in the – in the case of my advertising communications survey, about what is or what is not communicated."), 92:5–8 ("I am offering an opinion about whether it was communicated, not whether or not it was literally true or literally false or whether that communication was a misleading communication.").

Instead, Dr. Isaacson's "advertising communications" survey measured whether certain elements in advertisements from WowWee communicate or imply that My Avastars dolls *can be used with Roblox*, are *made with permission from Roblox*, or are *connected to or affiliated with Roblox* in some other manner." Ex. 46, ¶ 26 (emphases added). Dr. Isaacson concludes that the following messages were communicated by the two videos: (1) "You can use this doll as an avatar in Roblox"; (2) "You can customize this doll's appearance in Roblox"; (3) "You can buy hair and clothes for this doll in Roblox"; and (4) "This doll is made with permission from Roblox." *Id.* ¶¶ 43, 165. But, as set forth below, in 2022 when this video was posted, the product that WowWee was planning to release (the My Avastars dolls and a companion experience on the Roblox platform) *would* allow customers to use the My Avastars dolls as avatars in Roblox, customize the My Avastars dolls' appearance in Roblox, and buy hair and clothes for the My Avastars dolls in Roblox. *See infra* Section IV.B.1. Therefore, these messages could not be false or misleading; rather, if the test videos indeed communicated these messages, the messages accurately promoted the My Avastars dolls that, at the time these statements were made, were planned to be sold in conjunction with the My Avastars:RP experience on the Roblox platform.

The surveys are also not relevant to Roblox's trademark or trade dress infringement claims. In order for a plaintiff to succeed on a trademark or trade dress infringement claim, it must prove, among other elements, that "there is a substantial likelihood of confusion between the plaintiff's and defendant's products." *Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009); *see also Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012). To succeed on a trade dress infringement claim, a plaintiff also must prove that the trade dress or trademark has acquired secondary meaning. *See*

8

*Art Attacks Ink, LLC*, 581 F.3d at 1145. Dr. Isaacson concedes that he is not offering an opinion as to likelihood of confusion caused by WowWee's sale of the My Avastars dolls that Roblox alleges infringe its trade dress, about WowWee's alleged infringement of the ROBLOX mark, or about whether Roblox's alleged trade dress has secondary meaning. Ex. 47, 26:11–16. Therefore, this survey is not relevant to Roblox's trademark or trade dress infringement claim. *See Int'l Med. Devices, Inc. v. Cornell*, 2023 WL 4295194, at *1 (C.D. Cal. Feb. 13, 2023) (finding expert opinion not relevant where it "[did] not opine on, nor [did] it concern, any alleged trademark infringement," where the plaintiff's claim rested on alleged trademark infringement). Nor does Dr. Isaacson contend that any of his opinions relate to Roblox's copyright claims. *See* Ex. 46.

### 1.   Three of the four messages tested by Dr. Isaacson accurately promoted the My Avastars dolls in conjunction with the My Avastars:RP Experience

In 2021, WowWee had a novel idea for a fashion doll line that would appeal to girls who were also interested in online gaming: a fashion doll line called My Avastars that would have both a physical and an online presence, letting users play with their fully customizable dolls both in the real world and in parallel interactive online games and digital experiences. Dkt. 74 at 26 ¶ 4; R. Yanofsky Decl. ¶ 2; *see also* Ex. 18, 118:24–119:13; Ex. 2 ("WowWee has developed a concept called AvaStars as a toy + game IP, a 'Skylanders for girls', [sic] called AvaStars, that will live in the toy aisle, on Roblox, and who knows where else as it explodes!"). Given the success of their past collaborations, on October 13, 2021, WowWee partnered with Gamefam again to develop an independent game to be hosted on the Roblox platform, in which customers who purchased a doll could use a code to redeem a similar avatar to use within the experience. Ex. 56; *see also* Ex. 48 (WowWee-00029752 at -9757) ("Get a unique code with every doll … redeem in the game … play as your doll on Roblox!").

Beginning in 2021 and through 2022, Gamefam and WowWee worked on the My Avastars project, with WowWee working on the My Avastars dolls and Gamefam creating the corresponding digital game on the Roblox platform. *See, e.g.*, Ex. 70; *see also* Ex. 48. The My Avastars dolls were launched in June 2022, and the corresponding My Avastars:RP experience was set to launch in July 2022, which would have allowed consumers who bought the physical dolls to interact with a corresponding avatar in the metaverse. *See* Ex. 57 ("Kids can dress them up in real life in a way that feels just like the

game, reflecting their current styles and moods by changing stickers, mixing-and-matching clothing, layering different outfits, switching up hairstyles and adding tattoo stickers or clothing decals. Then, they can redeem a unique code that also comes with each doll in Roblox, enabling kids to bring their dolls to life online, unlocking new fashions, hairstyles and even facial features."). As such, when the two test videos went live in June 2022, the statements (1) "You can use this doll as an avatar in Roblox"; (2) "You can customize this doll's appearance in Roblox"; (3) "You can buy hair and clothes for this doll in Roblox"; were all accurate and consistent with WowWee and Gamefam's business arrangement and WowWee's plan to release the My Avastars dolls in conjunction with the My Avastars:RP experience on the Roblox platform.

Rather, it was Roblox's improper interference with WowWee and Gamefam's My Avastars project that prevented the MyAvastars:RP experience from launching in July 2022 as planned. *See* concurrently filed Mot. to Exclude the Test. of Mr. Blake Inglish at 3–5. As such, the three statements were neither false nor misleading when the videos were posted in June 2022. Because the messages that consumers took away from the advertisements were not false or misleading when the test videos were posted on TikTok, Dr. Isaacson's findings that the videos "communicated" those messages are not relevant to Roblox's false advertising claim.

### 2. The fourth "message" that Dr. Isaacson opines is associated with the advertising does not indicate an actionable level of confusion or deception

Only net 13.1% of respondents for the Fun to Customize video and net 13.8% of respondents for the Great Doll Line video indicated that the advertising communicated that the dolls were "made with permission from Roblox." Ex. 46, ¶ 107. This is the lowest measure for the four relevant messages in the Great Doll Line video and the second-lowest measure for the four relevant messages in the Fun to Customize video, *id.* at 45, Table G1, and does not indicate deception. In fact, according to Dr. Isaacson, "the net percentage that's ... typically taken [a]s indicating a significant or substantial measure [of confusion or deception] is generally 20 percent or higher and oftentimes in the range of 15 percent, depending on the context, is taken as indicating a substantial or significant percentage in advertising communications surveys." Ex. 47, 194:20–195:5; *see also William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir.), *supplemented sub nom. William H. Morris Co. v. Grp. W. Inc.*, 67 F.3d 310 (9th Cir.

1995) (finding 3% as not constituting significant deception and "noting that courts have found evidence sufficient where 21 to 34 percent of the recipients were deceived"); *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1040 (C.D. Cal. 1998) (finding that 6.9% was not sufficient evidence of confusion); McCarthy on Trademarks and Unfair Competition § 32:193 (5th ed.) ("Courts have found survey figures to be sufficient when they revealed that 15%, 20%, 21% to 34%, 'over 25%,' and 33% of respondents received a misleading message from the ad.") (citations omitted). Dr. Isaacson even concedes that these numbers are "on the border, where it might or might not be taken, if it was standing by itself, as indicating that something was communicated to a substantial degree." Ex. 47, 199:25–200:3. In fact, these numbers are far lower than the 20% measure generally indicating a significant or substantial measure, and even lower than the 15% range "oftentimes" taken as significant or substantial.

In sum, Dr. Isaacson's "advertising communications" survey did not present respondents with relevant stimuli, and the survey results are not relevant to any claims or defenses in this case. Exclusion of his opinions is warranted under these circumstances. *See Neo4j, Inc. v. PureThink, LLC*, 2023 WL 7093805, at *9 (N.D. Cal. Oct. 25, 2023) (excluding expert report "in its entirety as not relevant" where the only remaining counterclaims and defenses were not addressed by the expert testimony).

## C. Dr. Isaacson's "Advertising Communications" Survey Suffers From Several Other Flaws

Even if Dr. Isaacson had tested relevant advertising or opined about any relevant claim, the survey suffers from a host of additional flaws that render it unreliable and inadmissible. *See In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *15 (excluding a portion of Dr. Isaacson's survey because the methodological flaws made "the survey so flawed as to be completely unhelpful to the trier of fact and its probative value [was] substantially outweighed by its prejudicial effect") (citations and quotations omitted); *see also Reinsdorf*, 922 F. Supp. 2d at 877–79 (granting motion to exclude expert testimony where the "survey was fatally flawed, in that it was directed at an unrepresentative population, employed improper stimuli that produced biased responses, and failed to use adequate controls" because the "inadequacies speak not merely to the weight that should be accorded to the survey, but rather to the fundamental reliability of [the expert's] approach"); *Sec. Alarm Fin. Enters., L.P. v. Alder Holdings, LLC*, 2017 WL 5248181, at *7 (D. Alaska Feb. 21, 2017) ("[A] survey can be so fundamentally flawed

that it—and expert testimony based on it—are inadmissible. Here, the Court is convinced that the survey has 'substantial deficiencies, and not mere quibbles about methodology, that render it inadmissible.'") (quoting *In re: Autozone, Inc.*, 2016 WL 4208200 (N.D. Cal. Aug. 10, 2016)); *Senne v. Kan. City Royals Baseball Corp.*, 315 F.R.D. 523, 589 (N.D. Cal. 2016), *on reconsideration in part*, 2017 WL 897338 (N.D. Cal. Mar. 7, 2017), *aff'd in part, rev'd in part and remanded*, 934 F.3d 918 (9th Cir. 2019) (granting motion to exclude where survey methodology was "fundamentally flawed").

## 1. The survey used leading questions, and improper control video, and likely resulted in demand effects

A leading question is one where the desired answer is either directly or indirectly within the question itself, and where one of the answers to the question is more accurate, proper, or normatively acceptable than other answers. *See* Mike Rappeport, *Design Issues and the Value of Multiple Controls*, in Trademark and Deceptive Advertising Surveys, 259, 287 (Shari S. Diamond & Jerre B. Swann eds., 2nd ed. 2022). Similarly, demand effects occur when a consumer perception survey poses questions in a manner that leads respondents to make connections between companies they would not have necessarily otherwise made in the real world. *See* Lester Horwitz & Ethan Horwitz, Intellectual Property Counseling and Litigation, § 76.04 (2023).

Here, respondents in the "advertising communications" survey were primed to provide the "correct" answer that the two tested videos communicated messages that the My Avastars dolls were affiliated with Roblox in some way because "Roblox" was explicitly referenced in six of the 11 statements presented to consumers in Question 7. Moreover, the fact that none of the statements identified any specific company *other than* Roblox also flagged to consumers that the survey was testing some matter involving Roblox. Dr. Isaacson testified that "the survey needed to mention Roblox" and that "mentioning another company that wasn't Roblox … potentially would have been – would have put another name in consumers' heads that wasn't necessar – or thoughts that wasn't necessary for purposes of – of the survey." Ex. 47, 105:4–10. But he fails to explain *why* "put[ting] another name in consumers' heads" would have been problematic to the survey design, but merely claims that "it would have been problematic. The videos themselves refer to Roblox." *Id.* 106:7–8.

Further, the control videos *both* removed or altered all references to Roblox *and* added a

part of Roblox and cannot be customized or used in Roblox." Ex. 46, ¶¶ 36, 39. But "[a]dding a prominent disclaimer to the challenged advertisement (rather than purging the allegedly deceptive material from the control stimulus), also may not effectively account for noise in a survey if the disclaimer is suggestive or implants responses to the survey's close-ended questions." E. Deborah Jay, *Ten Truths of False Advertising Surveys*, 103 Trademark Rep. 1116, 1150 (2013); *see also Procter & Gamble Pharms., Inc. v. Hoffmann-LaRoche Inc.*, 2006 WL 2588002, at *24 (S.D.N.Y. Sept. 6, 2006) (finding the survey's control advertisement inappropriate where its "prominent disclaimer … was suggestive and implanted responses to closed-ended questions"). Because Dr. Isaacson removed references to Roblox from the control videos, the disclaimer at the end of the control videos was entirely unnecessary—and also likely primed respondents to choose answers that referred to Roblox.

The high number of respondents that apparently disregarded the disclaimer at the end of the control videos explicitly stating that "My Avastars Dolls are not a part of Roblox and cannot be customized or used in Roblox" further demonstrates that the survey primed respondents to provide the "correct" answer that the My Avastars dolls *are* a part of Roblox. Dr. Isaacson concedes that the control measures calculated using the control videos are "relatively high for control measures in this type of survey."[4] Ex. 46, ¶ 115. In fact, *40.9%* of respondents who viewed the Great Doll Line control video and *36.7%* of respondents who viewed the Fun to Customize control video nevertheless answered that the advertisement communicated or implied that "[y]ou can use this doll as an avatar in Roblox." *Id.* at 45, Table G1. Similarly, *36%* and *33.8%* of respondents who viewed the Great Doll Line and Fun to Customize control videos, respectively, answered that the advertisement communicated or implied that the "doll is made with permission from Roblox." *Id.* And *48.3%* and *45.2%* of respondents answered that the advertisement communicated or implied that "[y]ou can customize this doll's appearance in Roblox" after viewing the control videos. *Id.* Lastly, *47.3%* and *36.7%* of respondents who viewed the Great Doll Line and Fun to Customize control videos, respectively, answered that the advertisement communicated that "[y]ou can buy hair and clothes for this doll in Roblox." *Id.*

Dr. Isaacson attributes this unusual result to the claim that "the control videos still incorporate

---

[4] In contrast, the control measures for the control *statements* were much lower than the control measures for the control *videos*, despite the fact that both the control statements and control videos "have similar purposes." Ex. 46, ¶¶ 73, 116.

1       Dr. Isaacson attributes this unusual result to the claim that "the control videos still incorporate

2 elements of the trade dress asserted in this matter, because they do not alter the visual appearance of the

3 My Avastars dolls from the test videos." Ex. 46, ¶ 117. He bases this opinion on a random assortment of

4 "comments or reviews for My Avastars dolls posted by consumers" that Roblox's counsel provided to

5 him. *See id.* ¶ 118. Dr. Isaacson claims that "[t]hese comments or reviews indicated that some consumers

6 perceive an affiliation or connection between My Avastars dolls and Roblox based on perceived

7 similarity between My Avastars dolls and Roblox's asserted trade dress." *Id*. But expert opinion cannot

8 "merely summarize[] the record evidence and gratuitously interpret[] it with a conclusion that offers

9 nothing more than what [] counsel could argue to the jury in closing statements." *See Edwards*

10 *Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd*., 2022 WL 254348, *10 (N.D. Cal. Jan. 27, 2022) (granting

11 motion to preclude expert testimony as to sections of report not based on any specialized expertise).

12       Dr. Isaacson concedes that these 17 reviews are not representative of the universe of consumer

13 comments and reviews of the dolls, were selected and provided to him by Roblox's counsel, and that he

14 did not conduct any independent research on consumer reviews of the My Avastars dolls. Ex. 47, 145:8–

15 15; 149:21–23. He testified that he referenced these reviews because they were the reviews relevant to

16 his argument "that some consumers may perceive some similarity [to Roblox] and, based on that, may

17 – may perceive an affiliation or connection [with Roblox]." *Id*. 146:4–12. However, he also concedes

18 that "[he] can't say in every case that the [consumers' perceived] similarity is only based on physical

19 appearance," meaning, the asserted trade dress. *Id*. 148:24–149:5. Nonetheless, he bases this

20 conclusion—that the control measures for the control videos are much higher than the control measures

21 for the control statements because the control videos incorporate the asserted trade dress—on these 17

22 non-representative reviews, that may or may not be from consumers who believe there is a visual

23 similarity between the My Avastars dolls and Roblox. "The reasoning between steps in a theory must

24 be based on objective, verifiable evidence and scientific methodology of the kind traditionally used by

25 experts in the field." *Mullins*, 178 F. Supp. 3d at 901. Dr. Isaacson does not point to such "objective,

26 verifiable evidence and scientific methodology" here. Dr. Isaacson's conclusion is therefore unreliable

27 and should be excluded.

28

1

2           **2.    Dr. Isaacson did not screen for social media usage, and respondents may

3           never have been on social media**

4           Dr. Isaacson's advertising communications survey also failed to properly screen for respondents

5    who use social media, and therefore did not survey the proper audience that would have been exposed

6    to the TikTok videos. It is essential in a false advertising survey to show that the survey's universe

7    includes respondents who would have actually been exposed to the advertising. *See* David H. Bernstein

8    & Bruce P. Keller, *Survey Evidence in False Advertising Cases*, in Trademark and Deceptive

9    Advertising Surveys, 210 (Shari S. Diamond & Jerre B. Swann eds., 2nd ed. 2022); *see also Reinsdorf*,

10   922 F. Supp. 2d at 877; *Kournikova*, 278 F. Supp. 2d at 1125. However, the screening questions

11   presented to prospective respondents of the advertising communications survey did not even ask

12   prospective respondents whether they use social media, let alone whether they use TikTok. *See* Ex. 46,

13   Ex. 3 at 2–11.

14          Nor can one simply assume that the survey respondents use social media. Dr. Isaacson testified

15   that one reason he did not include social media usage as a qualification for the survey is that "the usage

16   of social media is a common thing." Ex. 47, 65:13–16. But many of the survey respondents were children

17   between the ages of 6 and 12—in fact, 320 respondents of the 827 respondents in the final database were

18   children within that age range. Ex. 46, ¶ 79. But only 44% of kids between the ages of 6 and 12 use

19   TikTok. *See* Tom De Leyn et al., *In-between child's play and teenage pop culture: tweens, TikTok &

20   privacy*, 25, J. of Youth Studies (2021). And Dr. Isaacson testified that he does not "have an opinion

21   about whether [children as young as six years old are] on social media or not." Ex. 47, 66:25–67:6.

22   Therefore, social media usage is not necessarily a "common thing" for children in this age group, and

23   there is a high likelihood that almost half of the 320 respondents ages 6 to 12 would not have been

24   exposed to the advertising that Dr. Isaacson tested.

25          **3.    The control statements are not realistic**

26          As set forth above, one control method that Dr. Isaacson used in his advertising communications

27   survey was the inclusion of control statements: 1) "You must mail cash or a personal check to purchase

28   this doll" and 2) "You cannot purchase this doll if you live in California." Ex. 46 at 43, Table F. Given

1    the prevalence of online shopping in normal, everyday life, it is not believable or realistic that WowWee

2    (or any toy company, for that matter) would only accept mailed cash or a personal check. And it is also

3    not plausible that any business selling consumer goods in the United States would prohibit consumers in

4    the state with the largest population from purchasing its products. Dr. Isaacson did not conduct research

5    to determine whether there are indeed dolls that can only be purchased by mailing cash or a personal

6    check. *See* Ex. 47, 115:5–8. Therefore, there is no evidence that the statement "You must mail cash or a

7    personal check to purchase this doll" is a "plausible" statement. *See id*. 110:24–111:12. Nor does Dr.

8    Isaacson know whether there are dolls that cannot be shipped to California. *See id*. 119:6–9. Moreover,

9    when asked whether he considered whether children as young as six years old would know what a

10    personal check is, Dr. Isaacson responded "that it's possible that a six-year-old might or might not know

11    what a personal check is." *Id*. 117:13–24.

12    Therefore, in addition to failing to test any relevant stimuli or any issue relevant to Roblox's

13    claims, Dr. Isaacson's "advertising communications" survey suffers from a number of design and

14    methodological flaws that also render it inadmissible.

15    **D.    Dr. Isaacson's Materiality Survey Is Fatally Flawed**

16    Dr. Isaacson's materiality survey is irrelevant for many of the same reasons as his advertising

17    communications survey; primarily because the survey tested the same irrelevant and stale Great Doll

18    Line and Fun to Customize advertisements. This survey should be excluded for that reason alone;

19    however, it also suffers from additional flaws that render it inadmissible.

20    The materiality survey used control statements, but did not use control videos, and asked

21    respondents to predict their own purchasing behavior—flaws that render the survey unreliable. First,

22    respondents are bad at identifying the motivations for their behavior. *See* Richard E. Nisbett & Timothy

23    D. Wilson, *Telling more than we can know: Verbal reports on mental processes*, Psychological Rev. 84,

24    231–259 (1977). Dr. Isaacson justifies this design of the materiality survey by stating that "[e]verything

25    in both surveys is self-reported. When I ask people about messages that would be communicated, that's

26    self-reported." Ex. 47, 187:16–19. But asking a respondent to self-report whether they take away a

27    message from a video—something they are doing in that moment—is entirely different than asking a

28    respondent to predict whether they would take a specific hypothetical action, especially one involving

16

spending money. Dr. Isaacson's survey design does not address this major difference. And Dr. Isaacson could have controlled for self-reporting inaccuracies by using control videos in his materiality survey and comparing the responses for the test videos to the responses for the control videos, but instead used only control "statements." Because Dr. Isaacson failed to control for these self-reporting inaccuracies, the respondents' answers to Question 8 of the materiality survey are unreliable.

Dr. Isaacson's materiality survey is also flawed because it asked respondents to indicate whether each of the 11 statements in Question 8 would make them more or less likely to purchase the fashion doll in the TikTok video that they viewed, *regardless* of whether those respondents had reported that they took away those statements from the videos in the first place. *See* Ex. 46, ¶ 133. In order words, Dr. Isaacson asked respondents whether a particular message would affect their purchasing behavior when they did not necessarily take that message away from the video at all. Although Dr. Isaacson testified that he likely has conducted advertising communications and materiality in a single survey previously, Ex. 47, 178:6–12, here, the materiality survey respondents were entirely different individuals than the advertising communications survey respondents. Ex. 46, at 29 n.56. The respondents who indicated that a message would influence their purchasing decision are not the same respondents who indicated the advertisement they viewed communicated these messages. Therefore, the results of the materiality survey do not demonstrate that any of the respondents who took away specific messages from the advertisement they viewed also found those messages to be material, or vice versa. This undermines Dr. Isaacson's conclusions that the four messages that consumers took away from the advertisements are material to consumer purchasing behavior and that consumers are more likely to purchase My Avastars dolls if they believe that the dolls are compatible with Roblox or made with permission from Roblox. *See id*. ¶ 167. These conclusions should, therefore, be excluded.

### E. Dr. Isaacson's Opinions Relate Only to Roblox's False Advertising Claims, For Which Roblox Has Proffered No Damages Theory

Dr. Isaacson's surveys relate solely to Roblox's false advertising claims. *See* Ex. 46, ¶¶ 127–129; Ex. 47, 26:11–16. But even if Roblox could possibly prove up that claim (which it cannot, as set forth in WowWee's concurrently filed motion for summary judgment), there is no relief that the Court could grant. First, because WowWee ceased referencing Roblox in connection with the My Avastars dolls

1  shortly after being sued, R. Yanofsky Decl. ¶ 4, any request for injunctive relief is moot. *See Luxul Tech.*

2  *Inc. v. NectarLux, LLC*, 2016 WL 3345464, at *13 (N.D. Cal. June 16, 2016) (granting motion for

3  summary judgment as to copyright infringement claims where the defendant had already removed the

4  allegedly infringing materials); *Little Oil Co. v. Atl. Richfield Co.*, 852 F.2d 441, 445 (9th Cir. 1988)

5  (affirming dismissal of false advertising claims where the claims for injunctive relief were moot). Second,

6  Roblox has come forward with no actual damages theory connected to its false advertising claims. In

7  fact, Roblox recently confirmed that the only damages it seeks are "hypothetical-license damages," which

8  are only relevant to Roblox's trade dress and copyright infringement claims, and "unjust enrichment."

9  *See* Ex. 106. Indeed, Roblox's damages expert confirmed unequivocally that his "reasonable royalty"

10  analysis was relevant only to Roblox's claims for copyright and trade dress infringement—not the false

11  advertising claims. *See* Ex. 51, 13:25–14:2. ████████████████████████████

12  ████████████████████████████████████████████████████ *See* Ex.

13  43, ¶ 209. This, along with the irrelevance of Dr. Isaacson's analysis and the serious flaws in his surveys,

14  counsels heavily toward excluding Dr. Isaacson's opinions at trial.

15  **V.    CONCLUSION**

16      For the foregoing reasons, Dr. Isaacson's surveys and opinions in his affirmative expert report

17  are irrelevant and unreliable. The Court should therefore grant Defendants' Motion to Exclude the

18  Testimony of Dr. Bruce Isaacson.

19

20  Dated: March 29, 2024              WINSTON & STRAWN LLP

21

22                          By: */s/ Jennifer A. Golinveaux*
                                Jennifer A. Golinveaux (SBN: 203056)
23                              JGolinveaux@winston.com
                                Thomas J. Kearney (SBN 267087)
24                              TKearney@winston.com
                                WINSTON & STRAWN LLP
25                              101 California Street, 35th Floor
                                San Francisco, CA 94111-5840
26                              Telephone:(415) 591-1000
                                Facsimile: (415) 591-1400
27
                                Michael S. Elkin (admitted *pro hac vice*)
28                              MElkin@winston.com
                                WINSTON & STRAWN LLP

200 Park Avenue
New York, NY 10166-4193
Telephone:(212) 294-6700
Facsimile: (212) 294-4700

Diana Hughes Leiden (SBN: 267606)
DHLeiden@winston.com
WINSTON & STRAWN LLP
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
Telephone:(213) 615-1700
Facsimile: (213) 615-1750

Michael D. Bednarek (admitted *pro hac vice*)
michael@bednareklegal.com
BEDNAREK LEGAL, PLLC
1100 N. Glebe Road, Suite 1010
Arlington, VA 22201
Telephone:(202) 997-1665
Facsimile: (703) 224-8001

Attorneys for Defendants
WOWWEE GROUP LIMITED, WOWWEE
CANADA, INC., WOWWEE USA, INC., and
GRAMPS GOODS, INC.