1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    ROBLOX CORPORATION,                     Case No. 22-cv-04476-SI

8                    Plaintiff,

9            v.                              **ORDER RE: SIX *DAUBERT* MOTIONS**

10   WOWWEE GROUP LIMITED, et al.,           Re: Dkt. Nos. 214, 215, 216, 219, 221, 247

11                   Defendants.

12

13          Plaintiff Roblox Corporation ("Roblox") and defendants WowWee Group Limited, et al.

14   ("WowWee") have each filed three motions to exclude the testimony of the opposing party's experts

15   under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

16   579 (1993). Having carefully considered the papers filed and each expert report, the Court hereby

17   (1) DENIES WowWee's motion to exclude the expert testimony of Dr. (Michel) Tuan Pham; (2)

18   GRANTS IN PART AND DENIES IN PART Roblox's motion to exclude the expert testimony of

19   Dr. Ian Bogost; (3) GRANTS IN PART AND DENIES IN PART Roblox's motion to exclude the

20   expert testimony of Mr. David Franklyn; (4) DENIES WowWee's motion to exclude the expert

21   testimony of Dr. Bruce Isaacson; (5) DENIES WowWee's motion to exclude the expert testimony

22   of Mr. Blake Inglish, and (6) GRANTS Roblox's motion to exclude the expert testimony of Mr.

23   Christian Tregillis contained in section 3.1 of his reports.

24

25                                    **LEGAL STANDARD**

26          Federal Rule of Evidence 702 permits the introduction of expert testimony only if "(a) the

27   expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand

28   the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c)

United States District Court
Northern District of California

1  the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects

2  a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. "To

3  qualify as an expert, a witness must have 'knowledge, skill, experience, training, or education'

4  relevant to such evidence or fact in issue." *U.S. v. Chang*, 207 F.3d 1169, 1172 (9th Cir. 2000)

5  (citing Fed. R. Evid. 702). On December 1, 2023, Rule 702(d) was amended to "clarify and

6  emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court

7  that it is more likely than not that the proffered testimony meets the admissibility requirements set

8  forth in the rule." Fed. R. Evid. 702 (Advisory Committee Notes, 2023 Amendments).

9      The proponent of the expert testimony has the burden of proving the proposed expert

10  testimony is admissible. *Lust ex rel. Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir.

11  1996). Expert testimony is admissible "only if it is both relevant and reliable." *Kumho Tire Co.,*

12  *Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). However, Rule 702 "should be applied with a 'liberal

13  thrust' favoring admission." *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014)

14  (citing *Daubert*, 509 U.S. at 588). "Shaky but admissible evidence is to be attacked by cross

15  examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v.*

16  *Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

17      Rule 702 requires that the trial court act as a "gatekeeper" by "making a preliminary

18  determination of whether the expert's testimony is reliable." *Elsayed Mukhtar v. Cal. State Univ.,*

19  *Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002) (citations omitted); *see Daubert v. Merrell Dow*

20  *Pharms., Inc.*, 509 U.S. 579, 597 (1993). The decision whether to admit or exclude expert testimony

21  lies within the trial court's discretion. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 141-42 (1997);

22  *United States v. Calderon–Segura*, 512 F.3d 1104, 1109 (9th Cir. 2008). The Ninth Circuit has

23  acknowledged that *Daubert* "may be harder to apply when the expert testimony is 'experience-

24  based' rather than 'science-based.'" *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir.

25  2020). "But any such difficulty cannot simply lead to a 'that goes to weight, not admissibility'

26  default." *Id.* Additionally, Rule 702 "makes no relevant distinction between 'scientific' knowledge

27  and 'technical' or 'other specialized' knowledge." *Kumho Tire*, 526 U.S. at 147.

28

United States District Court
Northern District of California

**DISCUSSION**

**I.      WowWee's Motion to Exclude the Expert Testimony of Dr. (Michel) Tuan Pham**

WowWee moves to exclude the opinions and testimony of Dr. (Michel) Tuan Pham in their entirety.  Roblox presents Dr. Pham as a "recognized expert in branding, marketing, and consumer psychology" in relation to its trade dress infringement claim.  Dkt. No. 261 at 1.[1]  Dr. Pham applies "major branding, marketing, and consumer psychology principles" that he lays out in his report to four "key issues" he was asked to evaluate: (1) the "strength and value of the Roblox brand"; (2) the "commercial strength of Roblox's classic avatars and the role that they play in Roblox's business"; (3) the "effects of WowWee's sales and marketing of the My Avastar dolls on consumers"; and (4) the "harm to Roblox that is likely to result as a consequence of WowWee's sales and marketing of the My Avastar dolls."  Dkt. No. 220, Ex. 73 ("Pham Rpt.") ¶ 40.  In his report and analysis, Dr. Pham relies on eleven "Reference Avatars," including four avatar "bases" that are not referenced in the First Amended Complaint ("FAC").  *See* Dkt. No. 220, Ex. 74.

**A.      Dr. Pham's Secondary Meaning Opinions**

In assessing the commercial strength and value of Roblox's classic and neoclassic avatars, Dr. Pham opines that the "asserted Roblox trade dress is distinctive and is strongly associated with Roblox as a brand in the minds of relevant consumers.  In other words, according to my analyses, this trade dress has acquired secondary meaning."  Pham Rpt. ¶ 88.  Dr. Pham makes this assertion based on his review of avatar downloads on the Roblox platform, samples of avatars and game icons, licensed Roblox products including books and figurines, and avatars in other games.  *See id.* ¶¶ 72-86.

WowWee first argues that Dr. Pham's opinions are "irrelevant" and should be excluded because he fails to define a coherent or consistent trade dress, even in the set of eleven Reference

---

[1] Dr. Pham indicates that his expertise "is in the areas of marketing and branding, and consumer behavior and psychology, especially with regard to how consumers make judgments and decisions and how they respond to marketing information and communications."  Dkt. No. 220. Ex. 73 ¶ 3.

Avatars he claims exemplify the trade dress. Dkt. No. 214 at 11-12; Dkt. No. 302 at 1, 5. Dr. Pham relied on the trade dress description alleged in the FAC. He states that his Reference Avatars "support the view that the claimed trade dress elements are generally visible across the asserted avatars and avatar bases, even if not all asserted elements of the trade dress are visible for every asserted avatar base and avatar." Pham Rpt. ¶ 70(a). The Court addressed the arguments WowWee raises about Roblox's description of its trade dress and the consistency of its trade dress in the separate Order on WowWee's motion for summary judgment.

WowWee next argues that even if Dr. Pham's report addressed a discernable trade dress, his opinions would still be irrelevant to secondary meaning because he does not (and based on his evidence could not) express an opinion that the public primarily associates the asserted trade dress with Roblox as the "single producer or source." Dkt. No. 214 at 13. Secondary meaning can be established in a variety of ways, including established place of a brand in the market, and the Court finds Dr. Pham's opinions relevant to this way of establishing secondary meaning. *See Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1214 (9th Cir. 2023). WowWee also presents numerous other critiques of Dr. Pham's methodology. The Court believes WowWee has some valid criticisms of Dr. Pham's methodology, but finds that these criticisms are grounds for cross-examination, can be addressed by WowWee's rebuttal experts, and do not render his testimony unreliable under Rule 702.[2]

## B.    Likelihood of Consumer Confusion Opinions

WowWee takes issue with the evidence Dr. Pham opines shows "that WowWee's sales and marketing of the My Avastars doll are creating significant consumer associations with Roblox in the marketplace, and some degree of consumer confusion about the relation between the My Avastars product and Roblox." *See* Dkt. No. 214 at 18; Pham Rpt. ¶ 113. WowWee contends that because Dr. Pham opines only that confusion is "possible," his opinion is irrelevant to likelihood of

---

[2] Among other critiques, WowWee contends that that Dr. Pham misapplies the "model of perceived similarity" that he relies upon. Dkt. No. 302 at 13. The Court agrees that Dr. Pham does not adequately explain how he applied this model to the facts of this case. But this alone is not grounds for exclusion.

United States District Court
Northern District of California

confusion.  Dkt. No. 214 at 18-19.  A plaintiff must show more than "simply a possibility" of confusion. *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012). Although Dr. Pham's report uses the term "possible confusion," the Court finds that it is for the trier of fact to determine whether the evidence Roblox has presented, including Dr. Pham's testimony, shows more than a possibility of confusion.

Dr. Pham also discusses purported evidence of "actual confusion" in the form of eleven inquiries from consumers who had purchased My Avastars dolls.  *See* Pham Rpt. ¶¶ 98-112; Dkt. No. 220, Ex. 94.  WowWee argues these inquiries are irrelevant to confusion because none of them express or can reasonably be read as implying that the writer believed Roblox was the source of the My Avastars dolls or that the My Avastars doll they purchased had been approved by Roblox.  Dkt. No. 214 at 19-20.  WowWee further contends that this evidence lacks any nexus to Roblox's alleged trade dress so it would be irrelevant to Roblox's trade dress infringement claim.  *Id.* at 21.  This may be a good argument for trial, but the Court again does not find it to be a reason to exclude Dr. Pham's testimony about consumer confusion and association. These complaints concern how the evidence is interpreted and go to the weight of the evidence, not its admissibility.

WowWee also contends that Dr. Pham does not meaningfully consider any of the *Sleekcraft* factors in a trade dress context.  Dkt. No. 214 at 20; Dkt. No. 302 at 14.  The *Sleekcraft* factors are not exhaustive and experts need not establish every element of a claim for their opinion to be relevant.  *Rearden*, 683 F.3d at 1210; *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

WowWee contends that Dr. Pham does not meaningfully address the strength of Roblox's trade dress because he focuses on the strength of the Roblox "brand," not trade dress, and "brand" refers to Roblox's trademark.  *Id.*  In the section of his report titled "Strength of Roblox as a Brand," Dr. Pham includes a "brief review of Roblox's history in the gaming and virtual experience market" and "marketing indicators of the strength and value of Roblox as a brand," including "number of users, engagement, and bookings," "consumer brand awareness and perceptions," and "following on social media and online search."  Pham Rpt. ¶¶ 41-64.  Earlier in his report, Dr. Pham clarifies that the "legal term for brand is trademark" and at his deposition he indicated that "my opinion was mostly about the use of the trade dress" on the My Avastars dolls.  *Id.* ¶ 22; Dkt. No. 220, Ex. 39 at

75:9-11.  At his deposition, Dr. Pham also testified that Roblox as a brand and Roblox as a company are "largely the same."  Dkt. No. 220, Ex. 39 at 75:19-25.  In the next section of his report, Dr. Pham addresses the "commercial strength and value of Roblox's classic and neoclassic avatars."  Pham Rpt. § VIII.  Dr. Pham concludes Section VIII of his report with: "In summary, there is strong evidence that Roblox's asserted trade dress . . . is likely to be strongly associated with Roblox as a brand in relevant consumers' minds."  Pham Rpt. ¶ 87.  The Court agrees with WowWee that Section VII of Dr. Pham's report does not appear to address the strength of Roblox's trade dress.  However, likelihood of confusion is also an inquiry for trademark infringement and the extent to which the strength of the Roblox brand is related to the strength of its trade dress is a matter of interpretation.

WowWee also takes issue with Dr. Pham's analysis of two "marketing and research documents" from WowWee that he opines go to WowWee's intent in developing the My Avastars dolls.  *See* Pham Rpt. ¶ 20.  Dr. Pham discusses these documents in the context of this statement: "My review of WowWee's marketing research and planning documents related to the launch of [the My Avastars dolls] indicates that the company's original intention was to connect the My Avastars dolls to the Roblox platform, positioning these dolls as akin to Roblox avatars 'in real life.'"  *Id.*  Dr. Pham goes on to state that the "original slogan for the My Avastar doll was 'the New Kids on the Blox,' a clear reference to the Roblox name" and the My Avastars dolls are "marketed with the slogan 'Avatar Stars of the Metaverse,' which points to an intended connection to the metaverse in which Roblox is a major player."  *Id.*  WowWee indicates the marketing slogan "The New Kids on the Blox" was never used.  Dkt. No. 214 at 22.  WowWee contends that Dr. Pham's statements here are speculation unrelated to his expertise or experience, and lack any nexus to the asserted trade dress.  *Id.*  The Court finds that these opinions are relevant to some of the *Sleekcraft* factors.  WowWee can cross-examine Dr. Pham about his methodology, but these critiques again do not rise to the level of grounds for exclusion under Rule 702.

Finally, WowWee contends that Dr. Pham's opinion about dilution and "harm to the Roblox brand as a result of WowWee's action" is irrelevant to any issue in this case.  Dkt. No. 214 at 22; Pham Rpt. ¶¶ 114-128.  Dr. Pham opines that the sales and marketing of the My Avastars dolls "is likely to harm Roblox by diluting the asserted avatar trade dress, causing an unwanted transfer of

associations to the Roblox brand, and a partial loss of control of the Roblox brand identity." *Id.* ¶ 12.  Roblox responds that Dr. Pham does not opine on whether Roblox establishes a Lanham Act dilution claim, rather his use of the term "diluting" is used to describe how the My Avastars dolls harm the Roblox brand.  Dkt. No. 261 at 24.  The Court agrees that this testimony about harm to the Roblox brand could be relevant to Roblox's claims.

For the aforementioned reasons, WowWee's motion to exclude the expert testimony of Dr. Pham is DENIED.

## II.      Roblox's Motion to Exclude the Expert Testimony of Dr. Ian Bogost

Roblox moves to exclude the opinions and testimony of Dr. Bogost in their entirety.  Dr. Bogost is "internationally recognized as a key figure in game studies" and has published 10 books and 150 articles on videogames and digital culture, given over 180 presentations at academic and industry conferences and events, and developed video games himself.  Dkt. No. 220, Ex. 37 ("Bogost Rpt.") ¶¶ 7-15.  WowWee asked Dr. Bogost to rebut "certain aspects" of Dr. Pham's report, including his "opinions concerning the consistency of Roblox's asserted trade dress and whether the asserted trade dress is 'typical' of Roblox's online avatars."  Bogost Rpt. ¶ 2.  WowWee also asked Dr. Bogost to provide his opinion on: (a) the extent to which "elements of Roblox's asserted trade dress and copyright claims are reflected in the Roblox avatars"; (b) "[w]hat precedents exist in video games for characters with features corresponding to those Roblox claims as unique, distinct, and nonfunctional, and defines as the 'Roblox trade dress'" in the FAC; and (c) the relationship between Roblox's "Avatar Bases" and the Cindy, Kenneth, Dennis, and Lindsey ("CKDL") registered avatars.  *Id.*

### A.      Dr. Bogost's Opinions About the Consistency of Roblox's Asserted Trade Dress

Dr. Bogost first opines that the "asserted Roblox trade dress does not consistently appear in Roblox avatars or characters."  Bogost Rpt. ¶ 4.  To reach this conclusion, Dr. Bogost "performed an analysis" of the avatars at issue in this case and the avatars discussed in Dr. Pham's report by evaluating each property asserted as a trade dress element in the FAC in relation to these

United States District Court
Northern District of California

"specimens." *Id.* ¶ 23.  He also considered "other versions of Roblox characters or avatars available on the platform" because Roblox alleged in the FAC that as a result of its marketing and advertising efforts, "the Roblox trade dress is widely recognized by the consuming public as a designation of the source of the Roblox avatars and Avatar Figurines." *Id.*; Dkt. No. 36 ¶ 60.  This opinion purportedly rebuts Dr. Pham's opinion that Roblox's asserted trade dress is "typical" of or "common" in Roblox avatars.  Dkt. No. 269 at 1; *see* Pham Rpt. ¶ 71.  Roblox contends that this opinion should be excluded because it addresses subject matter within the understanding of an average juror and because it is not based on reliable methods or data.  Dkt. No. 216 at 1, 6.

Expert testimony subject matter "must be beyond the common knowledge of the average layman." *U.S. v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002).  However, the Ninth Circuit has indicated that "[w]e must be cautious not to overstate the scope of the average juror's common understanding and knowledge." *U.S. v. Finley*, 301 F.3d 1000, 1013 (9th Cir. 2002).  The Ninth Circuit's "proper subject matter inquiry has generally focused upon whether the expert testimony improperly addresses matters within the understanding of the average juror." *U.S. v. Rahm*, 993 F.2d 1405, 1413 (9th Cir. 1993) (internal quotation marks and citation omitted).  The Court finds that Dr. Bogost's rebuttal testimony on the consistency of Roblox's trade dress will help the jury understand the evidence, is informed by his expertise in game studies, and directly rebuts Dr. Pham's opinion about whether Roblox's trade dress is observable and typical, which was based on a "holistic assessment" of a set of avatars compared to a set of Reference Avatars. *See* Pham Rpt. ¶ 70; Dkt. No. 220, Ex. 39 at 108:14-24.

Roblox next contends that Dr. Bogost's analysis is not based on sufficient facts or data.  Dkt. No. 216 at 10.  Specifically, Roblox contends that Dr. Bogost "cannot explain what avatars, nor how many avatars, he reviewed to reach his conclusion." *Id.* at 11.  When asked whether he looked at any "Roblox Avatars beyond what are cited to or included in your report" Dr. Bogost replied: "The analysis [described] is based on an explanation of a number of different Roblox Avatar[] styles. Among them those that were cited as exemplifying the asserted trade dress." Dkt. No. 216-2, Ex. 2 ("Bogost Dep.") at 173:15-24.  When asked how many avatars on the Roblox platform he analyzed as part of his research he responded . . . "I couldn't answer that question sitting here . . . That's not

United States District Court
Northern District of California

the way I carried out the analysis is what I would say." *Id.* at 168:19-169:2.

Roblox relatedly contends that Dr. Bogost's analysis is not based on reliable principles and methods because he "self-selects an unknown population of avatars from Roblox's platform to review and provides no way to replicate the population." Dkt. No. 216 at 13-14.  When asked at his deposition if one wanted to understand what Dr. Bogost "looked at to conclude that a certain characteristic is not typical" Dr. Bogost replied that he believes his analysis explains what he did and how he reached the conclusions and "[i]f you want to know how you would replicate the process by which I carried out the argument, it's difficult for me to offer an answer other than to have been inside my brain and body the whole time."  Bogost Dep. at 169:18 - 170:14.  When asked "if someone wanted to replicate the research that you did and [] look at the same set of avatars that you looked at, how would they do that?" Dr. Bogost responded: "I guess I reject the idea that looking at the same set of avatars is a relevant or accurate way of describing my analysis."  *Id.* at 169:18-24.  Roblox contends that his opinion thus "fails the hallmark requirement of testability."  Dkt. No. 216 at 14.

Roblox also contends that Dr. Bogost does not articulate the criteria he used to make his determination that certain of Roblox's trade dress elements are not "common" or "typical."  Dkt. No. 216 at 15.  When asked whether "'common' suggests some amount of frequency" at his deposition, Dr. Bogost responded: "I don't know.  That's an interesting philosophical question."  Bogost Dep. at 197:14-17.  When asked what meaning of "common" he intended, he responded "all I can say is in the ordinary sense."  *Id.* at 198:7-11.  Roblox contends that consequently, "even if someone could replicate and re-review the universe of avatars Dr. Bogost reviewed . . . they still could not replicate Dr. Bogost's analysis."  Dkt. No. 216 at 15.

"As a prerequisite to making the Rule 702 determination that an expert's methods are reliable, the court must assure that the methods are adequately explained."  *U.S. v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002).  "*Daubert* discussed several reliability factors, including testing, peer review and publication, known or potential rate of error, and general acceptance in the relevant scientific community." *Valencia-Lopez*, 971 F.3d at 898 (citing *Daubert*, 509 U.S. at 592-94).  "But the reliability inquiry is a flexible one, and the district court has broad latitude to determine what

factors in *Daubert*, if any, are relevant to the reliability determination." *Id.* (internal quotation marks and citations omitted).  The Court does not find the purported lack of testability dispositive here and does not find Dr. Pham's methodology that Dr. Bogost seeks to rebut substantially more reliable than Dr. Bogost's methodology that Roblox critiques such that exclusion on this basis would be appropriate.

### B.      Dr. Bogost's Opinion About Whether the Asserted Trade Dress is Unique to Roblox

Dr. Bogost's second opinion is that "the Roblox avatar appearance described by the asserted trade dress properties is not unique to Roblox."  Bogost Rpt. § B; *see also id.* ¶ 5 ("the properties Roblox claims are distinctive and original to its avatars are very common in video games").  To "demonstrate how commonplace" the properties that allegedly distinguish the Roblox trade dress are, Dr. Bogost "directed [his] research assistant to review and analyze games created between 1995 and 2019 for matches to the asserted distinctive properties of Roblox avatars."  Bogost Rpt. ¶¶ 67-68.  The goal "was not to create a complete record of all games with avatars bearing some o[r] all of these properties, but to produce a record of a plurality of such games for comparison, and to demonstrate how easy it is to produce such examples."  *Id.* ¶ 69.  Overall, Dr. Bogost and his assistant cataloged 141 games that he opines include at least one of Roblox's asserted trade dress elements.  *Id.* ¶ 70.  He also documented which trade dress features appeared in which games.  *See id.* ¶¶ 70-96.  The purpose of this review was to rebut Dr. Pham's opinion that Roblox's trade dress is "not common among other prominent gaming and virtual experience platforms that involve avatars."  *See* Pham Rpt. ¶¶ 70-71.

Roblox contends that the number of games Dr. Bogost and his assistant reviewed is unknown and Dr. Bogost could not recreate the complete dataset, so WowWee has not established that Dr. Bogost's opinion is based on sufficient facts and data and his opinion is unreliable because no one will be able to replicate his results.  Dkt. No. 216 at 17, 20.  Roblox further contends that Dr. Bogost's failure to document that games he reviewed to identify the 141 games "makes it impossible to know 'how easy' it was" to produce the 141 examples.  *Id.* at 19 (quoting Bogost Rpt. ¶ 68).

United States District Court
Northern District of California

United States District Court
Northern District of California

When asked at his deposition what "universe" of games Dr. Bogost's research assistant looked at, Dr. Bogost replied that "[t]he idea wasn't to identify which games did or didn't exhibit a property or any number of properties, but to simply find a supply of games" and it was "not our intention to claim that we have fully cataloged all the games that have one or more properties."  Bogost Dep. at 238:9-18.  He later testified that he did not keep a list of the games that he analyzed because "we wouldn't have needed to to form the opinions I articulated."  *Id.* at 241:23-242:4.  Games that did not match any properties of the Roblox avatars are not listed in Dr. Bogost's report and there is no record of what those games are.  *Id.* at 239:17-240:3.

The Court finds Dr. Bogost's opinions on this matter proper rebuttal testimony to Dr. Pham's examination of images in the Instagram feeds of eight other gaming and virtual experience platforms, from which he concluded that Roblox's asserted trade dress was "not common" and "visually distinct."  *See* Pham Rpt. ¶¶ 71, 85-87; Dkt. No. 220, Exs. 85, 92.  Dr. Pham did not provide information about the "universe" of games he reviewed or were in existence to select the eight his opinion is based on.[3]  Roblox complains that Dr. Bogost instructed his research assistant to identify only examples that would support his conclusion, but Dr. Pham also only discusses examples that support his conclusion.

The Court finds *Atmel Corp. v. Info. Storage Devices, Inc.*, 189 F.R.D. 410, 418 (N.D. Cal. 1999) instructive. There, the court excluded the plaintiff's expert's testimony that the plaintiff's alleged trade secrets were not generally known or published.  *Id.* at 416.  The defendant's rebuttal experts opined that the alleged trade secrets were generally known and cited published references.  *Id.* at 414, 418.  The plaintiff sought to exclude the rebuttal experts' testimony, arguing they had relied on the same methodology in formulating their opinions.  *Id.* at 418.  The court denied the motion, reasoning that the defendant's rebuttal experts "only needed such references as would show that the alleged trade secrets were public" and "had to search only until they had identified published

---

[3] Roblox contrasts Dr. Bogost's analysis with Dr. Pham's in a footnote, asserting that Dr. Pham "provides the entire universe of games he relied on in reaching conclusion that Roblox's trade dress is distinctive."  Dkt. No. 216 at 18 n.3 (citing Pham Rpt. ¶ 85).  Dr. Pham's "universe" consisted of 8 games, and the same can be said of Dr. Bogost's analysis here – he provides a record of the 141 games he relied on in reaching the opposite conclusion.

materials that they believed revealed the plaintiff's alleged trade secrets." *Id.* The Court further reasoned that "[t]o prove a positive, one example will suffice, but to prove a negative, a broader search is required." *Id.* Here, Dr. Bogost only provided such references as would support his opinion that Roblox's alleged trade dress elements are common to rebut Dr. Pham's opinion that Roblox's asserted trade dress is "uncommon" or "not common." *See* Pham Rpt. ¶¶ 70(c), 71, *see also* ¶ 87(e) (opining that the Roblox avatar trade dress is "visually distinct"). The cases Roblox relies on are factually distinct and do not persuade the Court to reach a contrary conclusion. Roblox distinguishes *Atmel* by contending that there, the rebuttal expert opined on an "absolute," in other words on a matter that lent itself to a yes or no answer. Dkt. No. 291 at 12. The same could be said here: the question is whether the Roblox's asserted trade dress is common outside the Roblox platform. Dr. Pham says no; Dr. Bogost says yes. The jury will decide.

### C.     Dr. Bogost's Opinion About Whether the CLKD Works Are Derivative Works

Dr. Bogost's third opinion is that the Cindy, Lindsey, Kenneth, and Dennis avatars (the "CLKD works") "are not derivative works" of the avatar bases "because they were not copied from them" and are "simply, new avatars." Bogost Rpt. ¶ 108. Dr. Bogost based this opinion on his understanding from WowWee's counsel of how a derivative work is defined by the Copyright Act and his review of deposition testimony from Roblox personnel. *See id.* ¶¶ 100-106. Roblox contends that Dr. Bogost improperly offers an opinion on an ultimate issue of law and that this opinion is not rebuttal to any testimony offered by Dr. Pham. Dkt. No. 216 at 1, 22. WowWee contends that Dr. Bogost addresses whether the CLKD works were copied from the avatar bases. Dkt. No. 269 at 21.

"Expert testimony concerning an ultimate issue is not per se improper" however "an expert witness cannot give an opinion as to her *legal conclusion, i.e.*, an opinion on an ultimate issue of law." *Elsayed Mukhtar v. Cal. State Univ. Hayward*, 299 F.3d 1053, 1065 n.10 (9th Cir. 2002); *see also Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("Expert testimony is not proper for issues of law. Experts interpret and analyze factual evidence. They do not testify about the law."). "Similarly, instructing the jury as to the applicable law is the distinct and exclusive

12

province of the court." *Hangarter v. Provident Lilfe and Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (citation and internal quotation marks omitted). However, "a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible" and "a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Id.* at 1017.

The Court agrees with Roblox that Dr. Bogost's opinion that the CLKD works "are not derivative works" is an improper opinion about a legal conclusion. *See Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 08-cv-03181, 2010 WL 4065465, at *9 (S.D. Tex. Oct. 9, 2010) (agreeing with the plaintiff that an expert's opinions about derivative works "must be excluded as improper legal opinions" and whether the plaintiff's architectural designs are "derivative works" is an issue "for the trier of fact to decide"). The Court will not permit Dr. Bogost to testify about whether the CLKD works are derivative works. The portion of Dr. Bogost's report containing this opinion is analogous to arguments raised in WowWee's summary judgment motion, with the addition of a bit of background about avatars. However, Dr. Bogost can testify about whether the CLKD works were copied from the avatar bases.

For the aforementioned reasons, Roblox's motion to exclude the expert testimony of Dr. Bogost is GRANTED IN PART AND DENIED IN PART.

**III.    Roblox's Motion to Exclude the Expert Testimony of David Franklyn**

David Franklyn was retained by WowWee to "critique the opinions and analyses expressed by" Dr. Pham. Dkt. No. 220, Ex. 44 ("Franklyn Rpt.") at 3. As part of his rebuttal analysis, Mr. Franklyn conducted "two consumer perception surveys" – "one to measure the likelihood of confusion between the My Avastars fashion dolls and Roblox's asserted trade dress in its avatars, and the other to measure whether Roblox has secondary meaning in its asserted trade dress in the context of physical dolls." *Id.* These surveys are not the subject of this motion. Dkt. No. 219 at 4. Mr. Franklyn holds a J.D. from the University of Michigan Law School and is currently a professor of intellectual property law at Arizona State University, Sandra Day O'Conner College of Law and Executive Director of the McCarthy Institute for IP and technology law. Franklyn Rpt. at 3; Dkt.

United States District Court
Northern District of California

No. 270, Ex. 58 ("Franklyn CV").

Roblox moves to exclude the rebuttal opinions and testimony of Professor David Franklyn "that Dr. Pham does not establish secondary meaning or likelihood of confusion to the extent that these opinions and testimony state legal standards and legal conclusions."  Dkt. No. 219 at 12. Roblox further requests the Court exclude Mr. Franklyn's opinions and testimony "rebutting Dr. Pham's marketing-based methodologies and conclusions to the extent that they are beyond Mr. Franklyn's areas of expertise."  *Id.*  Roblox "is not challenging admissible critiques relating to specific evidence" Dr. Pham considered.  Dkt. No. 290 at 3.

### A.      Whether Mr. Franklyn Impermissibly Opines on Legal Standards and Conclusions

Roblox contends that one set of Mr. Franklyn's excludable statements relate to his assertion that "Pham's opinion that Roblox has acquired secondary meaning in the claimed trade dress is based on a three-prong framework . . . that has no foundation in the relevant law or social science literature pertaining to secondary meaning."  *See* Franklyn Rpt. at 5.  At his deposition, Mr. Franklyn explained that "when I say it has no basis in the law, I've never seen a case, myself, that says if a feature, a design feature, is – meets [the requirements of Dr. Pham's three-prong framework], it is likely to have secondary meaning . . . And then in the social science literature, I haven't seen it either."  Dkt. No. 219, Ex. 3 ("Franklyn Dep.") at 247:11-21.[4]  Dr. Pham testified at his deposition when asked if he had an opinion about whether the three criteria are sufficient to prove secondary meaning as a legal matter that he was not offering a legal opinion and "[i]t is my professional opinion as a marketing expert and consumer psychology expert, that these three principles are the correct principles to evaluate from my perspective, the degree to which the trade dress is likely to be – to have what is called legally as secondary meaning."  Dkt. No. 229, Ex. 39 at 186:5-21.  Mr. Franklyn

---

[4] Dr. Pham opines that "the degree to which people are likely to use the characteristics of the stimulus to categorize it . . . as belonging to a certain mental category—here, a brand— is a function of three factors: (a) Are the characteristics observable . . . (b) Are the characteristics typical of other members of the category in question . . . (c) Are the characteristics uncommon in members of alternative categories? . . ."  Pham Rpt. ¶ 70.  This is the "three-prong framework" the parties refer to here.

United States District Court
Northern District of California

1    can critique Dr. Pham's three-part framework methodology; this is permissible rebuttal testimony

2    that will help the jury understand the relevance of this framework to the legal issues to be decided.

3    But he may not testify that this framework has no foundation in the relevant law.

4           Roblox contends that another set of Mr. Franklyn's excludable statements relate to his

5    assertion that "all three of Pham's concocted criteria could be met and that still would not come

6    close to establish secondary meaning." *See* Franklyn Rpt. at 6.  To support this assertion, Mr.

7    Franklyn cites *McCarthy on Trademarks and Unfair Competition* legal treatise.  *See id.* at 20, 31.

8    At his deposition, Mr. Franklyn testified that "[t]hat's not enough, under the law, to get to secondary

9    meaning." Franklyn Dep. at 252: 12-17.  The Court agrees that this is an improper legal conclusion.

10          The next set of statements Roblox seeks to exclude relate to Mr. Franklyn's opinion that

11   "when products present no consistent look, and are vastly different in look and design, there is no

12   protectable trade dress." *See* Franklyn Rpt. at 18.  Mr. Franklyn cites several cases in support of

13   this opinion.  *See id.*  Testimony about whether Roblox has a legally protectable trade dress

14   constitutes an improper legal conclusion.  However, Mr. Franklyn's opinions about whether the

15   avatars have a consistent look considering Roblox's asserted trade dress is proper rebuttal expert

16   testimony, as are his critiques of the methodology Dr. Pham used to examine whether Roblox's

17   asserted trade dress is "common and typical within the Roblox brand universe."  *See* Pham Rpt.

18   ¶ 71.

19          Roblox also takes issue with Mr. Franklyn's opinions that "Dr. Pham's opinions about

20   consumer association, dilution, and possible confusion do not establish likelihood of confusion as a

21   matter of law." Dkt. No. 219 at 4, 9.  First, Roblox points to Mr. Franklyn's assertion that association

22   is legally irrelevant to establishing likelihood of confusion.  *See* Franklyn Rpt. at 7, 37, 47.  The

23   Court agrees that this is improper expert testimony about the law.  WowWee's counsel can raise

24   these legal arguments themselves.  The same is true of Mr. Franklyn's opinions that possible

25   confusion is not the relevant legal standard for determining likelihood of confusion.  WowWee's

26   counsel already raised this argument in WowWee's motion to exclude the testimony of Dr. Pham.

27   Second, Roblox points to Mr. Franklyn's opinions about whether Dr. Pham's opinions about dilution

28   are irrelevant because Roblox has not claimed dilution, and about whether Dr. Pham has crafted

United States District Court
Northern District of California

"any defensible argument that the My Avastars dolls dilute the claimed potential trade dress." *See id.* at 44-46.  The Court finds that Mr. Franklyn's conclusion that Roblox cannot establish dilution is excludable as a legal conclusion.  It is also irrelevant because Roblox has not brought a dilution claim.  However, Mr. Franklyn can challenge the evidence Dr. Pham relies upon to reach these conclusions.

In sum, the Court agrees with Roblox that portions of Mr. Franklyn's report contain impermissible legal conclusions or would constitute improper instruction about the applicable law.  Portions of Mr. Franklyn's report read like a third legal brief and several arguments raised by WowWee in its motion to exclude the expert testimony of Dr. Pham are also raised by Mr. Franklyn.  Mr. Franklyn may not testify about what the law is, state the legal standards, or opine on whether the evidence presented does or does not establish secondary meaning and likelihood of confusion.  He may not explain the law or make legal arguments that WowWee's counsel has made in its motion to exclude Dr. Pham's testimony.

However, many of Dr. Franklyn's opinions in his report are of not of this nature.  Mr. Franklyn can opine about factual issues that would assist the trier of fact understand the evidence or determine a fact in issue.  Specifically, Mr. Franklyn can opine on whether the avatars have a consistent look and the consistency of the asserted trade dress.  He can criticize Dr. Pham's methodologies and the evidence Dr Pham relies upon.  He can also provide his conflicting interpretations of the evidence Dr. Pham's relies upon.

**B.      Whether Mr. Franklyn is qualified to rebut Dr. Pham's Methodologies**

Roblox separately contends that "Mr. Franklyn is not qualified to assess the reliability and rigor of Dr. Pham's methodologies because he is not a marketing expert."  Dkt. No. 219 at 11.  WowWee contends that Mr. Franklyn is "qualified to assess the reliability of Dr. Pham's methodologies" not only because of his experience in the marketing field as a professor of business, marketing, and advertising at Golden Gate University's Business School, but also because he has conducted hundreds of consumer surveys, which require him to analyze markets and marketing data and methodologies.  Dkt. No. 267 at 12.  Mr. Franklyn does not have any degrees in marketing,

economics, or social sciences.  Franklyn Dep. at 15:5-10.  He taught business school at Golden Gate University with a three-year appointment during which he taught "several classes relating to marketing and surveys."  *Id.* at 14:24-15:2.  He further testified that he has "done a lot of marketing analysis as part of [his] survey work" and "the nature of this work, survey work, really requires some knowledge about markets and the ways markets work."  *Id.* at 108: 21-25.  He has also published extensively and presented at numerous conferences and symposiums.  *See* Franklyn CV.

Roblox specifically argues that all of Mr. Franklyn's "opinions about Dr. Pham's use of the three-pronged framework and the conclusions he reaches thereunder should be excluded" on the basis of Mr. Franklyn's qualifications.  Dkt. No. 219 at 12.  Mr. Franklyn testified at his deposition that his opinion that this framework is "not an accepted methodology . . . for proving or disproving the existence or nonexistence of secondary meaning" was based on "[m]y reading of the social science literature that he cites and just general social science literature that I'm aware of and my reading of the case law on secondary meaning and my teaching of trademark law for 27 years and writing about it and my experience being retained over 250 times as an expert in trademark cases, including scores of cases involving secondary meaning.  I've never seen anything like it from a marketing professor or from a non-marketing professor as – as being somehow the foundation upon which one could build inferences of secondary meaning."  Franklyn Dep. at 249:12-250:3.  At his deposition, Mr. Franklyn provided examples of marketing research he has conducted in conjunction with his surveys.  *See* Franklyn Dep. at 110:13-112:9.  He also explained how he has gained insights into consumer psychology through his consumer surveys.  *See id.* at 112:10-113:9.

The Court finds that Mr. Franklyn at his deposition and WowWee in its opposition have sufficiently demonstrated that Mr. Franklyn has sufficient experience to critique Dr. Pham's methodologies pertaining to secondary meaning and likelihood of confusion.[5]

\* \* \*

---

[5] Roblox relies heavily on *Jaguar Land Rover Ltd. v. Bombardier Recreations Products*, Inc, No. 16-cv-13386, 2019 WL 13032105 (E.D. Mich. Jan. 4, 2019) in its motion and reply.  There, a court excluded the rebuttal testimony of Mr. Franklyn on a motion *in limine*, noting that the court "is not persuaded that Mr. Franklyn is a marketing and branding expert because of his experience teaching marketing courses."  *Id.* at \*3.  The court did not further explain this statement.

The Court thus GRANTS IN PART AND DENIES IN PART Roblox's motion to exclude certain opinions and testimony of Mr. Franklyn.  Mr. Franklyn may not provide improper legal conclusions or testify about the law, but he may critique Dr. Pham's methodology and the evidence he relies upon.

## IV.    WowWee's Motion to Exclude the Expert Testimony of Dr. Bruce Isaacson

Dr. Isaacson was retained by Roblox to conduct two surveys for Roblox's false advertising claim, an advertising communications survey and a materiality survey.  Dkt. No. 220, Ex. 46 ("Isaacson Rpt.") ¶¶ 1, 4.  Both surveys measured two videos that WowWee's Vice President of Brand Development and Creative Strategy, Sydney Wiseman, posted to her TikTok account in June 2022.  *Id.* ¶¶ 27, 129; Dkt. No. 36 ¶ 79, n. 18, ¶ 87, n.25.  Dr. Isaacson refers to these videos as the "Great Doll Line" video and the "Fun to Customize" video.  Isaacson Rpt. ¶ 27.  Dr. Isaacson's advertising communications survey "measured whether certain elements in advertisements from WowWee communicate or imply that My Avastars dolls can be used with Roblox, are made with permission from Roblox, or are connected to or affiliated with Roblox in some other manner." Isaacson Rpt. ¶ 26.  Based on this survey, he concluded that "the elements from WowWee's advertising for My Avastars dolls that were measured in my survey—the use of the word 'Roblox' in narration and on-screen text, the screen recordings of the Roblox platform, and the reference to the My Avastars:RP experience on Roblox—communicate or imply that My Avastars have a connection to or affiliation with Roblox."  *Id.* ¶ 52.

Dr. Isaacson's materiality survey "measured whether statements relevant to advertisements for My Avastars dolls are material, meaning they are likely to influence consumer decisions about whether to purchase the dolls."  *Id.* ¶ 128.  Based on this survey, Dr. Isaacson concluded that "the statements 'You can use this doll as an avatar in Roblox,' 'This doll is made with permission from Roblox,' 'You can customize this doll's appearance in Roblox,' and 'You can buy hair and clothes for this doll in Roblox' are all material to consumer purchasing behavior, meaning that they are likely to affect consumer purchasing behavior."  *Id.*  ¶ 167.  He further concluded that "respondents are more likely to purchase the My Avastars dolls if they believe that the dolls are compatible with

1    Roblox or made with permission from Roblox." *Id.*

2

3    **A.    Whether Dr. Isaacson's Surveys Are Relevant**

4    WowWee first contends that Dr. Isaacson's surveys are irrelevant to Roblox's false

5    advertising claim because the two videos he tested were removed in 2022, so the surveys he

6    conducted in 2023 "did not present respondents with advertisements that were actually displayed

7    and available to consumers that he surveyed during the relevant time period, nor would any of the

8    survey respondents have even potentially seen them in 2022." Dkt. No. 215 at 6. WowWee further

9    contends that Dr. Isaacson concedes that he is not offering an opinion as to whether the videos he

10   tested "had any lasting effect on consumer perception[.]" *Id.* Roblox responds that "[i]t was

11   WowWee's use of these very videos to promote its dolls that gave rise to Roblox's false advertising

12   claims." Dkt. No. 260 at 8.

13   Both videos were posted by Ms. Wiseman in June 2022. *See* Dkt. No. 36 ¶ 79, n. 18, ¶ 87,

14   n.25. WowWee announced the release of the My Avastars dolls on June 28, 2022, with a planned

15   release of the My Avastars:RP experience in July of 2022. Dkt. No. 220, Ex. 57. Roblox sent

16   WowWee a cease-and-desist letter on July 8 2022. *Id.* Ex. 13. On July 22, 2022, Gamefam informed

17   WowWee that it would not publish any video game based on the My Avastars dolls. *Id.* Ex. 61.[6]

18   According to Richard Yanofsky of WowWee, following receipt of Roblox's cease-and-desist letter,

19   WowWee "undertook an effort" to remove any references to Roblox from all its marketing channels,

20   and to Mr. Yanofsky's knowledge, WowWee "has not referenced 'Roblox' in any such marketing

21   or advertising since July 20, 2022." Dkt. No. 211-1 ¶ 4. According to WowWee, the two videos

22   were removed from TikTok in September 2022. Dkt. No. 215 at 6. The initial complaint in this

23   case was filed on August 2, 2022 and the operative amended complaint was filed on September 19,

24   2022. Dr. Isaacson conducted the interviews for his survey from October 27, 2023 to November 5,

25   2023. Isaacson Rpt. ¶ 79. At his deposition, Dr. Isaacson indicated that it was not part of his

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

28       [6] In its motion for summary judgment, WowWee asserts that Gamefam "informed WowWee that it was pulling out of the project" on July 15, 2022. Dkt. No. 211 at 4. However, the letter is dated July 22, 2022.

United States District Court
Northern District of California

retention to have a broad understanding of how the dolls were advertised by WowWee.  Dkt. No. 220, Ex. 47 at 58:13-16.  He testified that he was asked by Roblox's counsel to test the two TikTok videos, which were specifically referred to in Roblox's amended complaint.  *Id.* at 68:2-69:1.  He further explained that he was not providing an opinion with respect to timing, but rather "about the messages that those videos communicate to . . . relevant consumers who are exposed to those videos."  Dkt. No. 260, Ex. 1 at 82:8-15.

WowWee cites *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866 (C.D. Cal. 2013) in support of its argument, but *Reinsdorf* says nothing about whether false advertising surveys must test advertisements that are live during the time the survey is conducted.  WowWee also points to *Kwan Software Engineering, Inc. v. Foray Technologies, LLC*, where this Court found the proponent of an expert survey failed to show that the survey examined the "proper universe of consumers" because the survey did not actually focus on potential users of the software at issue and the proponent "failed to show that potential users of the software are the relevant audience for its false advertising claims."  No. C 12-03762 SI, 2014 WL 572290, at **4-5 (N.D. Cal. Feb. 11, 2014).  This Court reasoned there that the proponent had not shown that any survey members were people who would see the alleged misrepresentations or people who were potential purchasers of the products.  *Id.* at *5.  By contrast, here prospective respondents to Dr. Isaacson's advertising communications survey "were qualified, among other criteria, as having answered that they had purchased 'a fashion doll' in the past 12 months, or that they were likely to purchase a fashion doll in the next 12 months."  Isaacson Rpt. ¶¶ 42, 57(vii).  The other cases WowWee cites also say nothing about the timing of when the tested advertisements must be available to be viewed by consumers.  Because Dr. Isaacson tested two videos referenced by Roblox in its amended complaint with respect to its false advertising claim, the Court finds that Roblox has met its burden of proving that Dr. Isaacson's proposed expert testimony is relevant.

WowWee separately contends that Dr. Isaacson failed to test any elements that Roblox must prove to succeed on its claims.  Dkt. No. 215 at 7.  Dr. Isaacson explained at his deposition that in his advertising communications survey he is not offering opinions about whether statements were literally true or literally false, or whether statements were misleading, but rather "what is or what is

not communicated." Dkt. No. 220, Ex. 47 at 91:18-92:17.  "Where a statement is not literally false and is only misleading in context, [] proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients becomes critical."  *William H. Morris Co. v. Group W. Inc.*, 66 F.3d 255, 258 (9th Cir. 1995); *see also Apple Inc. v. Amazon.com Inc.*, 915 F. Supp. 2d 1084, 1090 (N.D. Cal. 2013) ("[I]f an advertisement is not false on its face … the plaintiff must produce evidence, usually in the form of market research or consumer surveys, showing exactly what message was conveyed that was sufficient to constitute false advertising.").

Dr. Isaacson concludes that the following messages were communicated by the two videos: (1) "You can use this doll as an avatar in Roblox"; (2) "You can customize this doll's appearance in Roblox"; (3) "You can buy hair and clothes for this doll in Roblox"; and (4) "This doll is made with permission from Roblox."  *See* Isaacson Rpt. ¶¶ 43, 165.  WowWee contends that the first three of these messages were not false or misleading when posted in June 2022 because at that time, WowWee planned to sell the My Avastars dolls in conjunction with the My Avastars:RP experience on the Roblox platform.  Dkt. No. 215 at 8, 10.  Roblox contends that all four statements "were indisputably false at all times the ads were available because the My Avastars:RP experience never went live on the Roblox platform."  Dkt. No. 260 at 11.  The Court finds that there is a factual dispute about whether these statements were misleading when made, which is inappropriate for resolution at this stage.[7]  The Court further concludes that Dr. Isaacson's advertising communications survey is relevant to some of the elements of Roblox's false advertising claim.[8]

///

---

[7] In reply, WowWee contends that "[t]aken to its logical conclusion, Roblox's argument is that all advertising for products that have not yet been released are actionable under the false advertising laws, which obviously is not the case."  Dkt. No. 300 at 5.  However, this glosses over the facts as set forth by WowWee that WowWee "launched" the My Avastars dolls in June 2022, Gamefam informed WowWee "it was pulling out of the project" on July 22, 2022, and the videos remained on TikTok until September 2022.  *See* Dkt. No. 300 at 2; Dkt. No. 211 at 3-4; Dkt. No. 220, Ex. 61.

[8] The fourth message Dr. Isaacson concludes was communicated by the videos is discussed in the concurrently filed order on WowWee's motion for summary judgment.  WowWee's critique of Dr. Isaacson's survey with respect to that message goes to the weight to be given to the survey rather than its admissibility.

United States District Court
Northern District of California

### B.      Whether Dr. Isaacson's Surveys Are Reliable

"[S]urvey evidence should be admitted as long as it is conducted according to accepted principles and is relevant." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1037 (9th Cir. 2010) (citations and internal punctuation omitted). The Ninth Circuit has made clear that "technical inadequacies in a survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Id.* (citations and internal quotation marks omitted). In *Fortune Dynamic*, the party seeking exclusion of an expert survey had argued that the survey had several shortcomings, including that it failed to replicate real world conditions, may have been suggestive, and possibly produced counterintuitive results. *Id.* at 1037-38. The Ninth Circuit concluded that "these criticisms, valid as they may be, go to 'issues of methodology, survey design, reliability, . . . [and] critique of conclusions,' and therefore 'go to the weight of the survey rather than its admissibility.'" *Id.* at 1038 (quoting *Clicks Billiards, Inc. v. Sixshooters*, Inc., 251 F.3d 1252, 1263 (9th Cir. 2001)).

Here, Dr. Isaacson thoroughly explains the principles underlying his surveys in his report. Roblox has met its burden of demonstrating that his surveys were conducted in accordance with accepted principles for false advertising surveys. WowWee does not contend that Dr. Isaacson failed to conduct his surveys according to accepted principles. Rather, WowWee raises a series of specific alleged flaws with Dr. Isaacson's surveys. The Court has reviewed all the arguments WowWee raises, the cases WowWee relies on for support, Dr. Isaacson's deposition testimony, and Dr. Isaacson's report. The Court concludes that all the "flaws" WowWee points to, if flaws at all, bear on the probative value of Dr. Isaacson's testimony and are not proper grounds for exclusion. *See Fed. Trade Comm'n v. LendingClub Corp.*, No. 18-cv-02454, 2020 WL 2838827, at *13 (N.D. Cal. June 1, 2020); *see also Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) ("Challenges to survey methodology go to the weight given the survey, not its admissibility.").

For the aforementioned reasons, WowWee's motion to exclude the expert testimony of Dr. Isaacson is DENIED.

United States District Court
Northern District of California

**V.      WowWee's Motion to Exclude the Expert Testimony of Mr. Blake Inglish**

Mr. Inglish was retained by Roblox to "evaluate potential economic damages allegedly caused" by WowWee.  Dkt. No. 220, Ex. 50 ("Inglish Rpt.") ¶ 5.  He offers opinions about the hypothetical reasonable royalty Roblox and WowWee would have agreed that WowWee pay for a three-year non-exclusive license and about damages under an unjust enrichment theory.  *See id.* ¶¶ 9-10.

**A.      Mr. Inglish's Reasonable Royalty Analysis**

Mr. Inglish calculated a reasonable royalty rate using the hypothetical negotiation construct, a "framework for simulating the negotiations that would have occurred between a willing licensor and a willing licensee preceding the time of the first alleged infringement."  Inglish Rpt. ¶¶ 49, 51.  He uses the "non-exclusive *Georgia-Pacific* factors" to "assist in evaluating the economic pressures that would have been present during the hypothetical negotiation."  *Id.* ¶ 51.  Mr. Inglish was asked by counsel to assume that the hypothetical negotiation date should be around the date of the first reported sales of the My Avastars dolls, June 14, 2022.  *Id.* ¶ 50.

WowWee asserts that "several courts in this circuit have been hesitant to apply the *Georgia-Pacific* framework in copyright and trademark cases" in the absence of a patent claim.  Dkt. No. 247 at 14; Dkt. No. 295 at 2-3.  WowWee points to one case from the Central District of California that found an expert's use of the *Georgia-Pacific* framework for the calculation of a copyright license to be "unreliable" because "[i]n determining 'actual market value,' the question is not what the owner would have charged, but rather what is the fair market value[.]"  *Mattel, Inc. v. MGA Entertainment, Inc.*, No. CV 04-9049 DOC (RNBx), 2011 WL 836418, at *4 (C.D. Cal. Mar. 4, 2011).  WowWee also points to *Wag Hotels, Inc. v. Wag Labs, Inc.*, a summary judgment decision where the court found that "because there is no competent evidence of prior or anticipated licensing involving a royalty, Wag Labs's expert's reasonable royalty calculation is purely speculative and therefore inadmissible."  No. 20-cv-01326-BLF, 2023 WL 3605977, at *9 (N.D. Cal. May 22, 2023).  In its opposition, Roblox asserts that courts routinely use the *Georgia-Pacific* factors in copyright cases and Lanham Act cases, citing to a number of out of circuit decisions.  *See, e.g.*, *Focus Products*

23

*Group International, LLC v. Kartri Sales Co., Inc.*, 647 F. Supp. 3d 145, 233 (S.D.N.Y. 2022) (noting that "[a]bsent a prior licensing agreement, courts have awarded or approved of reasonable royalty damages if the evidence provides a sufficiently reliable basis from which to calculate them" and "[i]n such instances, the *Georgia-Pacific* factors serve as a guiding framework") (internal quotation marks and citation omitted).  Because the Court concludes below that Mr. Inglish's reasonably royalty opinions are sufficiently reliable under Rule 702, the Court does not find it appropriate to exclude his testimony on the basis that he used the *Georgia-Pacific* factors.

The heart of WowWee's argument is that "reasonable royalty damages are inappropriate here, as Mr. Inglish's method for calculating the reasonable royalty opinion is impermissibly based on undue speculation."  Courts in this Circuit "have explained that the *Georgia-Pacific* factors are impermissibly speculative where there is the absence of a prior licensing agreement, evidence of licensing negotiations between the parties, or evidence otherwise showing either side's intent to license."  *Wag Hotels, Inc.*, 2023 WL 3605977, at *9 (citations and internal quotation marks omitted); *see also Marketquest Group, Inc. v. BIC Corporation*, 316 F. Supp. 3d 1234, 1300 (S.D. Cal. 2018) ("In the absence of a prior licensing agreement between the parties, courts will permit reasonable royalty damages only if the evidence provides a sufficiently reliable basis to calculate such damages.").[9]  WowWee contends that Mr. Inglish's reasonable royalty damages are predicated on WowWee's sales "aspirations," which were made before Roblox's "interference drastically altered the My Avastars project," making his opinions unreliable.  Dkt. No. 247 at 15.  In his report, Mr. Inglish calculated average expected sales of $30 to $40 million annually during the three-year hypothetical license.  Inglish Rpt. ¶ 87.  WowWee specifically critiques Mr. Inglish's "reli[ance]" on deposition testimony from Richard Yanofsky of WowWee.  Dkt. No. 247 at 16; *see* Inglish Rpt.

---

[9] In *Wag Hotels* it was undisputed that the plaintiff had not entered into a royalty-based licensing agreement with a third party or produced any evidence it intended to do so in the future. 2023 WL 3605977, at *8.  In *Marketquest* Group, the court similarly found that the plaintiff had presented no evidence it had ever licensed any of its marks for use by third parties or intended to do so, nor was there evidence that the defendants had ever licensed their marks.  316 F. Supp. 3d at 1300-1301.  In contrast, here, Mr. Inglish used the Roblox/Jazwares royalty-based licensing agreement, an agreement the plaintiff entered into with a third party, as the benchmark license.

United States District Court
Northern District of California

¶ 74; Dkt. No. 220, Ex. 66 (deposition testimony).  The Court finds that what Mr. Yanofsky meant by his "expectations" is a factual dispute or matter of interpretation and that Mr. Inglish's reliance on his deposition testimony does not warrant exclusion under Rule 702.[10]

WowWee also contends that "Mr. Inglish's determination that WowWee's actual sales are irrelevant to the hypothetical negotiation . . . is a misapplication of the principles and methods to the facts of this case." Dkt. No. 295 at 10.  WowWee's actual sales of the My Avastars dolls were $5.4 million in U.S. sales through October 26, 2023.  *Id.*  WowWee contends that its actual sales are consistent with its "conservative sales projections prior to the products' launch," citing a "Possible Sales Outcomes" spreadsheet that shows "conservative" sales revenue projections of $5,055,000, "realistic" sales revenue projections of $9,675,000, and "aggressive" sales revenue projections of $16,435,000 for year one.  Dkt. No. 247 at 16; Dkt. No. 220, Ex. 67.  At his deposition, Mr. Inglish explained why he didn't rely on this sales projection spreadsheet.  *See* Dkt. No. 262, Ex. 1 at 211-12.  At his deposition, Andrew Yanofsky of WowWee testified with respect to this spreadsheet: "So this is speculative . . . This is again, like one of those, quote/unquote, scratch pads where I'm trying to apply some logic to anchor some deal parameters around" and "[t]his is my subjective opinion on June 29th, 2021." *Id.*, Ex. 3 at 398:7-19, 402:6-14.  WowWee takes particular issue with

---

[10] WowWee alternatively contends that Mr. Inglish did not reliably apply Mr. Yanofsky's "alleged sales projections" in his reasonable royalty calculation.  Dkt. No. 247 at 20; Dkt. No. 295 at 11.  Mr. Inglish concluded after reviewing all the *Georgia-Pacific* factors:

> Based on deposition testimony regarding WowWee's expectations ($40 to $60 million in the first six to ten months, with exponential growth in year two) and Roblox's historical success in licensing its products to Jazwares (approximately $30 million to approximately $59 million in average annual U.S. net sales of licensed toy products), as well as other information identified in this report, it's reasonable to assume that both parties would have expected My Avastars Fashion Dolls annual net sales in the U.S. to average at least $30 million to $40 million annually during the three-year hypothetical license[.]

Inglish Rpt. ¶ 87.  At his deposition, Mr. Inglish explained that given it was unclear whether Mr. Yanofsky was talking about net sales or gross sales and to be conservative, he assumed the high end of Mr. Yanofsky's range was 40 million.  Dkt. No. 220, Ex. 51 at 185:17-23.  He used the sales of the Jazwares products as another data point.  *See id.* at 186:6-23.  He explains that the approach he took was to be conservative, look at all the information, and "try to come out somewhere in the middle." *Id.* at 187:19-188:4.  The Court finds that Mr. Inglish has provided an adequate basis for this opinion.

paragraph 75 of Mr. Inglish's report. The Court does not find that Mr. Inglish's treatment of WowWee's actual sales numbers make his opinions unreliable, and "questions regarding which facts are most relevant for calculating a reasonable royalty are properly left to the jury" so long as the underlying methodology is sound. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014). Furthermore, the Federal Circuit has explained that requiring that "estimates of sales revenues, as referenced in a hypothetical negotiation at the time infringement began" bear a "close relation to actual sales revenue" would "essentially eviscerate the rule that recognizes sales expectations at the time when infringement begins as a basis for a royalty base as opposed to an after-the-fact counting of actual sales." *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001); *see also LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 188-89 (S.D.N.Y. Nov. 14, 2002) (explaining that "[a]n infringer's projected sales are often used as a basis for a reasonable royalty when the projections would have been available at the time of the hypothetical negotiation" and "[i]n contrast, post-negotiation sales projections are an after-the-fact assessment that the negotiating parties could not have considered").

Next, WowWee contends that even if Richard Yanofsky's sales "aspirations" could form the basis for a hypothetical license, the numbers would still not be applicable because they "assumed a use that never transpired"—that the "physical dolls would launch in tandem with a My Avastars:RP game." Dkt. No. 247 at 16, 19. It is undisputed that Mr. Yanofsky's testimony regarding $40 to $60 million in sales was for the sale of the My Avastars dolls with the corresponding My Avastars:RP experience on the Roblox platform, which never launched. *See* Dkt. No. 220, Ex. 66 at 120:19-121:2. The Court discusses the relevant law in its discussion of Roblox's motion to exclude Mr. Tregillis's testimony in section VI below. The Court does not find that Mr. Inglish's use of Mr. Yanofsky's testimony makes his opinions unreliable under Rule 702.

WowWee separately contends that Mr. Inglish's use of the Roblox-Jazwares license as the single benchmark license is unreliable. Dkt. No. 247 at 21. In his analysis of the *Georgia-Pacific* factors, Mr. Inglish found it "reasonable to assume that the Roblox/Jazwares license (a 'benchmark license') . . . would be the most appropriate starting point when determining a reasonable royalty." *Id.* ¶ 56. Mr. Inglish noted that WowWee produced four agreements with Gamefam related to the

1    use of WowWee-related intellectual property in games developed by Gamefam for the Roblox

2    platform or the sale of WowWee toys that were based on intellectual property from games developed

3    by Gamefam on the Roblox platform, but found they were "not as directly comparable to the

4    hypothetical license in this case as the benchmark license." *Id.* ¶¶ 58-59.  After completion of his

5    initial report, WowWee produced "many additional licenses relating to other toy lines."  Dkt. No.

6    247 at 24.  Mr. Inglish then prepared a supplemental report in which he reviewed these additional

7    agreements and concluded that none of them had "sufficient comparability to offer probative value

8    when evaluating a reasonable royalty in this case."  *See* Dkt. No. 220, Ex. 64 ¶ 7.

9           In attempting to establish a reasonable royalty rate, "the licenses relied on by the patentee in

10   proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit."

11   *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009).  In other words,

12   "[w]hen relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability

13   between different technologies or licenses does not suffice."  *LaserDynamics, Inc. v. Quanta

14   Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012).  However, "any reasonable royalty analysis

15   necessarily involves an element of approximation and uncertainty."  *Lucent*, 580 F.3d at 1325

16   (citation and internal quotation marks omitted).  "[T]he fact that a license is not perfectly analogous

17   generally goes to the weight of the evidence, not its admissibility."  *Ericsson, Inc. v. D-Link Systems,

18   Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014).

19          WowWee objects to the use of the Roblox/Jazwares license as the benchmark license on the

20   bases that it is not sufficiently comparable to the hypothetical license and that Mr. Inglish failed to

21   make downward adjustments, raising numerous specific objections.  *See* Dkt. No. 247 at 22-24.

22   Roblox responds with reasons why the Roblox/Jazwares agreement is an appropriate benchmark

23   and an overview of what Mr. Inglish considered in his report.  *See* Dkt. No. 262 at 19-25.  The Court

24   finds that these disputes go to weight and not admissibility.  *See Sonos, Inc. v. Google LLC*, No. C

25   20-06754 WHA, No. C 21-07559 WHA, 2023 WL 3933071, at *6 (N.D. Cal. June 9, 2023) ("that

26   a benchmark product is an imperfect benchmark product, or that there exists a better benchmark

27   product, goes to evidentiary weight, not admissibility"); *Bio-Rad Laboratories, Inc. v. 10X

28   Genomics Inc.*, 967 F.3d 1353, 1373 (Fed. Cir. 2020) ("the issue of comparability is often one of

sufficiency of the evidence, not admissibility"). Mr. Inglish's methodology is sufficiently reliable. He has shown a baseline comparability between the Roblox/Jazwares license and hypothetical Roblox/WowWee license and has adequately explained his opinions and analysis. He appears to have made both downward and upward adjustments to the hypothetical license to account for differences, and WowWee can cross-examine Mr. Inglish on whether he accounted for all the relevant differences between the benchmark and hypothetical licenses in this case.

### B.  Mr. Inglish's Unjust Enrichment Analysis

In Lanham Act actions, "[b]ecause proof of actual damage is often difficult, a court may award damages based on defendant's profits on the theory of unjust enrichment." *Lindy Pen. Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993). Similarly, in copyright infringement actions, "a prevailing plaintiff . . . is entitled to recover the infringer's profits to the extent they are attributable to the infringement" as an alternative to actual damages. *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 514 (9th Cir. 1985). In assessing profits for Lanham Act damages, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). Similarly, under the Copyright Act, "[i]n establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b).

In the unjust enrichment section of his report, Mr. Inglish asserts that WowWee reported $5,412,041 in gross sales from the My Avastars dolls through October 2023. Inglish Rpt. ¶ 102. WowWee's rebuttal expert Christian Tregillis analyzed WowWee's costs and calculated that WowWee's profits were negative $99,881. *See* Dkt. No. 220, Ex. 52 at ¶¶ 200-210. WowWee contends that because Mr. Inglish did not rebut Mr. Tregillis's conclusion that WowWee did not make a profit and did not offer any affirmative opinion on WowWee's profits, there is nothing for Roblox to recover on an unjust enrichment theory so Mr. Inglish's unjust enrichment opinions are irrelevant and permitting him to testify would then require WowWee to call Mr. Tregillis to testify about deductible costs, which would be a "pointless waste of time and judicial resources." Dkt. No.

247 at 25.  In its reply, WowWee further contends that "Roblox is essentially asking this Court to permit a placeholder expert opinion, based purely on speculation, to allow Mr. Inglish to rebut Mr. Tregillis's cost deductions at trial, despite never disclosing such opinions."  Dkt. No. 295 at 15. Agreeing with WowWee would require the Court to draw factual conclusions that are inappropriate for the Court to make at the summary judgment stage, much less in a *Daubert* motion.  The parties will provide updated information about sales and profits at trial.  There is no indication that Mr. Inglish will rebut Mr. Tregillis's cost deductions at trial, and if he does and WowWee believes this to be improper, WowWee may object at that time.

For the aforementioned reasons, WowWee's motion to exclude the expert testimony of Mr. Inglish is DENIED.

## VI.    Roblox's Motion to Exclude the Expert Testimony of Mr. Christian Tregillis

Roblox moves to exclude portions of the expert reports and testimony of Christian Tregillis. Mr. Tregillis was retained by WowWee to describe his opinions in rebuttal to Mr. Inglish's December 5, 2023 report (the report WowWee moves to exclude).  *See* Dkt. No. 220, Ex. 52 ("Tregillis Rpt.") ¶ 2.  Roblox seeks to exclude the opinion in section 3.1 of Mr. Tregillis's report and supplemental report.  *See* Tregillis Rpt. at 43-48; Dkt. No. 223, Ex. 3 ("Tregillis Supp. Rpt.") at 7-10.  This opinion is that "Mr. Inglish's reasonable royalty is not based on the use of Roblox's intellectual property actually made, as called out in case law he cited as a requirement, but rather a use that was not provided to WowWee, which results in a significant overstatement of the value WowWee received from the use of Roblox's intellectual property."  *Id.* ¶ 7.  WowWee contends that this is a rebuttal opinion "concerning a fatal flaw in Mr. Inglish's reasonable royalty analysis— that Mr. Inglish's reliance on sales expectations for the dual product anticipated but not released is inappropriate."  Dkt. No. 264 at 1.  Roblox contends that there are three problems with this opinion: it is "legally erroneous," "impermissible legal opinion," and "unreliable because it is premised on wholly unsupported factual assertions."  Dkt. No. 221 at 12.

1

**A.      Whether Mr. Tregillis's Opinions Are Legally Erroneous**

2      Roblox contends that Mr. Tregillis's interpretation of *Oracle Corporation v. SAP AG*, 765

3   F.3d 1081 (9th Cir. 2014) is "wrong as a matter of law" because is interprets the phrase "actual use

4   made" in *Oracle* "to mean that the jury must take into account at the *ex ante* hypothetical negotiation

5   Roblox's *ex post* efforts to protect its intellectual property[.]"  Dkt. No. 221 at 13; Dkt. No. 289 at

6   4.   WowWee contends that Roblox's actions "resulted in the sale of a fundamentally different

7   product than the one that drove the sales expectations Mr. Inglish used to estimate his reasonable

8   royalty damages" and this is what Mr. Tregillis's opinion is focused on.  *See* Dkt. No. 264 at 3.  In

9   reply, Roblox contends that this argument "relies on a critical mischaracterization of the intellectual

10   property at issue in this case."  Dkt. No. 289 at 10.  In sum, Roblox contends that a hypothetical

11   license to cover the use of Roblox's intellectual property in only the physical My Avastars dolls is

12   all that WowWee would have needed to launch its "dual product" because Roblox has "always

13   prohibited the unauthorized use of Roblox's Classic Avatars intellectual property in physical

14   products outside the Roblox platform" and "has always permitted the use of [such] intellectual

15   property on the Roblox platform[.]"  *Id.* at 10 (emphasis removed).  What a hypothetical license

16   would cover is a factual dispute inappropriate for resolution on a *Daubert* motion.

17      At his deposition, Mr. Tregillis explained that his "analysis is based on [Roblox] being

18   honest as of the date of the hypothetical negotiation" by "[e]xpressing that Roblox would engage in

19   actions to undermine the product[.]"  Dkt. No. 221, Ex. 4 at 77:2-6, 148:9-12.  When asked by

20   Roblox's counsel: "So . . . your opinion is based on your view that after Roblox granted a license to

21   WowWee, it would nevertheless send letters to retailers, telling them that WowWee was infringing

22   its intellectual property?"  Mr. Tregillis responded: "In order to comply with the law's requirement

23   of modeling a reasonable royalty for the use made, you're right, because that's what the use made

24   has been.  The use made was $5.4 million in sales due to the things that [Roblox] did."  *Id.* at 148:14-

25   149:1.  He further testified that "the case that your expert cited says [i]t has to be the use actually

26   made, and the use actually made involved [Roblox] making sure there was no My Avastars:RP game

27   that was expected to make this such a significant project, among other things that [Roblox] did."  *Id.*

28   at 103:10-16.

In assessing whether proffered expert testimony will assist the trier of fact in resolving an issue, courts "must look to the governing substantive standard." *Daubert*, 43 F.3d at 1320. The Ninth Circuit has explained that the "touchstone for hypothetical-license damages is the range of the license's reasonable market value." *Oracle*, 765 F.3d at 1088 (citation and internal punctuation omitted). "The question, therefore, is not what the owner would have charged, but rather what is the fair market value." *Id.* (internal quotation marks and citations omitted). "To calculate the 'market value' of the injury to the plaintiff based on a hypothetical-license theory, [courts] look to 'the amount a willing buyer would have been reasonably required to pay a willing seller at the time of the infringement for the actual use made by [the infringer] of the plaintiff's work.'" *Id.* at 1087 (quoting *Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't*, 447 F.3d 769, 786 (9th Cir. 2006)).[11] The Federal Circuit has explained that the hypothetical license approach "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before the infringement began." *Lucent*, 580 F.3d at 1325. In other words, the "hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement." *Id.*

WowWee contends that *Georgia-Pacific* requires analysis of post-hypothetical negotiation facts. Dkt. No. 264 at 16. The following *Georgia-Pacific* factors do appear to call for a consideration of such facts: (8) "The established profitability of the product made under the patent; its commercial success; and its current popularity" and (11) "The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

WowWee also contends that it is "axiomatic that a reasonable royalty analysis must be based on the alleged infringing product actually sold." Dkt. No. 264 at 13. The cases WowWee cites in

---

[11] *Wall Data* affirmed the district court's following jury instructions: ". . . Actual damages means the amount of money to adequately compensate the copyright owner for the reduction of the market value of the copyrighted work caused by the infringement. The reduction of the market value of the copyrighted work is the amount a willing buyer would have been reasonably required to pay a willing seller at the time of the infringement for the actual use made by the Los Angeles Sheriff's department of the plaintiff's work. That amount also could be represented by the lost license fees Wall Data would have received for the unauthorized copies." 447 F.3d at 786.

support of this position do not so hold.  The section of *Oracle* WowWee cites held that a plaintiff in a copyright infringement case is not required to show that it would ever have granted a license for the infringed material.  765 F.3d at 1087-88.  In *Phoenix Technologies Ltd. v. VMware, Inc.*, a court found the hypothetical dates of two experts admissible where they were "properly tied to the alleged dates of first infringement."  No. 15-cv-01414-HSG, 2017 WL 2001981, at *3 (N.D. Cal. May 11, 2017).  The court further found that to the extent one of the parties' motions *in limine* disputed the actual date of first infringement, that was a question of fact to be decided by a jury.  *Id.*  In *Applied Medical Resources Corp. v. U.S. Surgical Corp.*, the Federal Court reiterated "the rule that the hypothetical negotiation relates to the date of first infringement" and explained that "[t]here is nothing to suggest that [a court] should tie a hypothetical negotiation to a prior infringement no longer at issue."  435 F.3d 1356, 1364 (Fed. Cir. 2006).

　　　　The Court also does not read the cases Roblox relies on to mean that the hypothetical negotiation framework always precludes the consideration of post-negotiation facts unless patent law's book-of-wisdom doctrine is invoked.  The Federal Circuit has explained that it is incorrect to replace "the hypothetical inquiry into what the parties would have anticipated, looking forward when negotiating, with a backward-looking inquiry into what turned out to have happened."  *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 772 (Fed. Cir. 2014).  However, this same court held that "the district court did not err in considering [the defendant's] profits.  But it did err in treating the profits [] actually earned during the period of infringement as a royalty cap.").  Roblox repeatedly points to a statement in *Oracle* that it slightly mischaracterizes.  In addressing the argument that the jury's hypothetical-license damage award was based on undue speculation, the court in *Oracle* noted that "[a]lthough we look to the expectations of the parties at the time of the hypothetical negotiation in determining the hypothetical-license value . . . it is telling that, in the end, [a software company recently acquired by the defendant] had a total of only 358 customers by the time it closed its doors in 2008, a small fraction of the customers [the defendant] had hoped to attract."  *Oracle Corp.*, 765 F.3d at 1090.

　　　　Although the Court does not agree with either party's characterization of the law, it does find that the content of sections 3.1 of Mr. Tregillis's reports are contrary to the above discussed

United States District Court
Northern District of California

law because Mr. Tregillis focuses on Roblox's "interference" with WowWee's plans for a dual product. It would not be contrary to the law for Mr. Tregillis to opine that Mr. Inglish did not adequately consider the extent to which WowWee made use of Roblox's IP, but that is not what he focuses on in the section of his reports at issue. Additionally, the Court does not find that the opinion in section 3.1 of his reports is based on specialized knowledge that will help the trier of fact understand the evidence or determine a fact in issue. *See* Fed. R. Civ. P. 702. Many of the arguments in section 3.1 of his reports are arguments that would be more appropriately raised by WowWee's lawyers. *See Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*, No. 19-cv-06593-HSG, 2022 WL 254348, at *10 (N.D. Cal. Jan. 27, 2022) (concluding that an expert "merely summarize[d] record evidence and gratuitously interprete[d] it with a conclusion that offers nothing more than what [] counsel could argue to the jury in closing arguments"). WowWee's lawyers can argue about how the law should apply to the facts of this case. WowWee can also present the evidence that Mr. Tregillis cites to in this section of his reports.[12]

Roblox's motion to exclude the expert testimony of Mr. Tregillis embodied in section 3.1 of his reports is therefore GRANTED.

**IT IS SO ORDERED**.

Dated: September 3, 2024

SUSAN ILLSTON
United States District Judge

---

[12] Because the Court grants Roblox's *Daubert* motion on this basis, it does not reach the other arguments Roblox raises for exclusion of section 3.1 of Mr. Tregillis's reports.